2008 WY 3

**Keith Jordan BOOTH, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. S-07-0004.**

Supreme Court of Wyoming.

Jan. 10, 2008.

imposed a sentence of life without the possibility of parole (LWOP).[1] Booth entered into a plea bargain wherein he agreed to plead guilty to felony murder in exchange for the State deleting the premeditation aspect of first-degree murder and dismissing Count II of the complaint (aggravated robbery as defined by Wyo. Stat. Ann. § 6–2–401 (LexisNexis 2007)). He contends that the State breached the plea agreement by introducing evidence of premeditation and that, therefore, this Court should direct that he be permitted to withdraw his guilty plea. We will affirm the sentence as imposed.

Representing Appellant: Diane M. Lozano, State Public Defender; Tina N. Kerin, Appellate Counsel; Donna D. Domonkos, Senior Assistant Appellate Counsel. Argument by Ms. Domonkos.

Representing Appellee: Patrick J. Crank, Wyoming Attorney General; Terry L. Armitage, Deputy Attorney General; and D. Michael Pauling, Senior Assistant Attorney General. Argument by Mr. Pauling.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

HILL, Justice.

[¶ 1] Appellant, Keith Jordan Booth (Booth), seeks review of the district court's judgment and sentence which found Booth to be guilty of first-degree, felony murder and

## ISSUE

[¶ 2] Booth raises this issue:

Mr. Booth should be allowed to withdraw his guilty plea since the State breached the spirit of the plea agreement by introducing prejudicial evidence of intent over defense counsel's objection.

The State rephrases thus:

Did the State breach the plea agreement at sentencing when it introduced evidence that [Booth] intended to shoot Mr. Clarkson?

In his reply brief, Booth contends:

The State has misstated the standard of review in this case and is wrong in labeling the issue as an evidentiary issue. The issue is whether or not the plea agreement was breached.

---

1. Wyo. Stat. Ann. § 6–10–301 (LexisNexis 2007) states:

§ 6–10–301. **Life imprisonment without parole.**
(a) Pursuant to article 3, section 53 of the Wyoming constitution, a sentence of life imprisonment without parole is created for specified crimes designated in the Wyoming Criminal Code of 1982.
(b) A person sentenced to life imprisonment without parole shall not be eligible for parole and shall remain imprisoned under the jurisdiction of the department of corrections during the remainder of his life unless pardoned by the governor.
(c) A sentence specifically designated as a sentence of life imprisonment without parole is not subject to commutation by the governor. A sentence of life or life imprisonment which is not specifically designated as a sentence of life imprisonment without parole is subject to commutation by the governor. A person sentenced to life or life imprisonment is not eligible for parole unless the governor has commuted the person's sentence to a term of years.
Article 3, § 53 of the Wyoming Constitution provides:
§ 53. Creation of criminal penalties not subject to governor's power to commute
Notwithstanding Article 4, Section 5 of this Constitution, the legislature may by law create a penalty of life imprisonment without parole for specified crimes which sentence shall not be subject to commutation by the governor. The legislature may in addition limit commutation of a death sentence to a sentence of life imprisonment without parole which sentence shall not be subject to further commutation. In no event shall the inherent power of the governor to grant a pardon be limited or curtailed.
Article 4, § 5 of the Wyoming Constitution deals with the pardoning power of the governor.

## FACTS AND PROCEEDINGS

[¶ 3]   This is a case involving inexplicable, random, and tragic violence.  On August 19, 2005, Casper Police Officer Robin Tuma filed in the circuit court an affidavit in support of a warrant to arrest Booth.  In the affidavit, Officer Tuma averred that on August 18, 2005, the victim, Gregory Clarkson, was working as a cab driver in Casper.  After being dispatched to pick up a fare, Clarkson's radio traffic reported that he was being robbed, and that report was followed by "gurgling sounds."  This occurred between 6:00 a.m. and 7:00 a.m.  Shortly thereafter, Clarkson was found by a co-worker in a Casper park.  He was dead and still strapped into his seat by his seat belt.  Clarkson was killed by a single gunshot wound to the torso.[2]  The contents of his pockets had been removed, and the money he should have had for his fares for that day was missing.

[¶ 4]   In his confession, Booth indicated that Clarkson gave him about fifty dollars from a bank deposit bag.  Booth asked for everything in Clarkson's pockets as well, and Clarkson apparently had turned out his pockets to demonstrate that they were empty.  Booth's confession also indicated that he tried to knock out Clarkson so as to make his escape.  He attempted to achieve that result by striking Clarkson in the head with his pistol, and then again striking him in the head when the first blow did not suffice.  Mr. Clarkson was still able to strike a blow to Booth's face, although Booth was seated directly behind Clarkson in the backseat of the cab.  That blow bloodied Booth's lip.  Booth's reaction was to cock the pistol so that there was a round of ammunition in the chamber.  He said he did so to "scare" Clarkson, but he nonetheless proceeded to reach toward Clarkson with the pistol and fired one shot.  During his confession, Booth appeared not to know where the bullet had struck Clarkson.  He was informed by the interviewing officer that it struck Clarkson in the torso, as described in footnote 2.  Booth indicated that immediately after firing the shot, he jumped out of the cab and ran away.  During the course of his confession, Booth also indicated that he had associated himself with a "street gang" called "Sur 13," "Surenos 13," or "Surenos."

[¶ 5]   Near the scene of the crime, the police found a blue checked shirt and a grey hooded sweatshirt which appeared to have blood on it.  The police also found a Glock .40 caliber, semi-automatic pistol.  A spent cartridge similar to ammunition used in such a Glock pistol was found in Clarkson's cab.  Anonymous witnesses informed the Casper Police Department that Booth told them that he had been involved in a robbery and "had done something bad and that he was going to prison for a long time."  Those witnesses also stated that Booth had clothing similar to that found near the crime scene.  Another witness reported seeing a person, similar in description to Booth, and wearing similar clothing to that found near the crime scene, running from the crime scene area.  Booth was living near the crime scene area at the time these events occurred.  Police officers interviewed Booth and he admitted to robbing and killing Clarkson.

[¶ 6]   Pretrial proceedings were protracted by the need for a second preliminary hearing and by the need for two competency examinations.  In a notice entered of record on March 13, 2006, Booth conceded that he was competent.  On March 30, 2006, the district court directed the State to give notice of what penalty it intended to seek.  In a notice entered in the record on April 4, 2006, the State opted to seek LWOP, thus removing the death penalty as a potential disposition in this case.

[¶ 7]   On May 18, 2006, Booth changed his plea from not guilty, to guilty, as part of a plea agreement.  On August 30, 2006, the district court scheduled the sentencing hearing for October 11, 2006.  By notice filed of record on September 29, 2006, the State informed Booth that it intended to use his confession, as well as tape recordings of telephone calls Booth had made from the Natrona County Detention Center, as evidence at

---

2.  The affidavit says that Mr. Clarkson was shot in the head.  However, elsewhere in the record it is established that the victim was shot through the torso, the bullet passing from right to left through his body.

the sentencing hearing. The sentencing hearing was held as scheduled on October 11, 2006.

## STANDARD OF REVIEW

[¶ 8] Very recently we articulated our standard of review for circumstances such as these in *Frederick v. State,* 2007 WY 27, ¶ 13, 151 P.3d 1136, 1141 (Wyo.2007):

> When a plea of guilty is entered as a result of a plea agreement, any promises made by the State must be fulfilled and whether a prosecutor has violated an alleged agreement is a question that is reviewed de novo. *Spencer v. State,* 2005 WY 105, ¶ 12, 118 P.3d 978, 982–983 (Wyo. 2005). A plea agreement is a contract between the defendant and the State to which the general principles of contract law are applied. "When determining whether a breach of the plea agreement has occurred we: '(1) examine the nature of the promise; and (2) evaluate the promise in light of the defendant's reasonable understanding of the promise at the time the plea was entered.'" *Ford v. State,* 2003 WY 65, ¶ 11, 69 P.3d 407, 410 (Wyo. 2003). The prosecutor "must explicitly stand by" the terms of any agreement; and if the State is unable to carry out the terms, the correct remedy is withdrawal of the plea. *Ford,* ¶ 18, 69 P.3d at 412. The State may not obtain the benefit of the agreement and at the same time avoid its obligations without violating either the principles of fairness or the principles of contract law. *Id.*

[¶ 9] Also pertinent to this appeal is W.R.Cr.P. 32(d), which provides: "If a motion for withdrawal of a plea of guilty or nolo contendere is made before sentence is imposed, the court may permit withdrawal of the plea upon a showing by the defendant of any fair and just reason. At any later time, a plea may be set aside only to correct manifest injustice."

[¶ 10] At the sentencing hearing, Booth challenged the admissibility of his confession and the recorded telephone calls on the basis that those materials were not relevant to the punishment for the crime to which Booth entered his guilty plea. Although the State proposes a different standard of review than that we set out above, we conclude from the context of the record on appeal that the objections made at the hearing suffice for this Court to consider the issue specifically raised in this appeal.

## DISCUSSION

[¶ 11] At the outset, we note that Booth has not filed a motion to withdraw his guilty plea in the district court. Booth premises his appeal on facts that he was aware of, before sentence was imposed. If such a motion were to be filed in the district court, it would have to be considered there in light of the manifest injustice standard, and if further review were sought here, that standard would also apply on appeal. The only question clearly posed by this appeal, is if the State violated the terms of the plea agreement by offering evidence that Booth premeditated the crime, i.e., as if he were being sentenced for first-degree premeditated murder.

[¶ 12] The thrust of Booth's argument is that, by operation of the principles set out in Frederick, this Court should direct that Booth be permitted to withdraw his guilty plea. He reasons that his actual motivation for the plea, and the only apparent basis upon which he would have agreed to such a plea bargain, was that the plea might increase the likelihood that he would receive a life sentence, rather that LWOP. Those were the only two possible outcomes of his plea. Continuing, the reason he thought he might get life, instead of LWOP, is that his plea agreement did not allow the State to offer proof of premeditation. Furthermore, he asserts that, accepting Booth's recitation of the factual basis for his plea as the factual basis for sentencing, there is nothing in the guilty plea proceedings to indicate that he premeditated the murder or that he did not feel remorse for his crime. During the guilty plea proceedings, Booth indicated that his shooting Mr. Clarkson was an "accident," and that he felt "bad that I did it because that wasn't my intentions."

[¶ 13] Just before he provided the factual basis and entered the guilty plea, Booth ar-

ticulated, through his attorney, his understanding of the plea agreement like this:

Mr. Booth proposes to change his plea to a plea of guilty with respect to Count I. Count I will be amended to *delete the premeditation aspect* of first-degree murder, and he'll be entering a plea of guilty to felony murder. Count II will be dismissed. [Emphasis added.]

Sentencing will be at the discretion of the Court with the options of straight life or life without the possibility of parole. We will argue and present evidence that he deserves a sentence of straight life rather than life without the possibility of parole.

The State also gave its summary of the terms of the plea agreement:

That's my understanding as well, Your Honor.

**The operative language** in Count I for the plea **would provide that** on or about the 18th of August 2005, in the County of Natrona, in the state of Wyoming, **he did unlawfully, knowingly, and purposely, in the perpetration of any robbery kill another human being**; namely, Gregory Clarkson, in violation of 6–2–101(a) and (b).

Conditioned upon that plea as outlined by counsel, we'd also move to dismiss Count II. [Emphasis added.]

[¶ 14] Booth's argument is that he entered into the bargain believing that the State would not be permitted to offer evidence of the sort of premeditation which typically is used to support first-degree, premeditated murder.

[¶ 15] Central to this argument is that Booth was born on July 5, 1987, and at the time of the crime, he was 18 years, one and one-half months old. Although the record does not contain much detail about this subject, Booth was released from the Wyoming Boys School just a week before he committed the crime at issue here. At the sentencing hearing, the State produced evidence which arguably was directed at the subject of premeditation, over the objection of the defense. That evidence at least suggested he premeditated the murder of whomever the cab driver might have been who answered his call and,

furthermore, that he did not feel remorse about the crime. Of course, it also went to establishing that Booth had committed the robbery and murder "knowingly" and "purposely." A tape recording of Booth's confession was played for the district court, as were recorded phone calls Booth made from the jail. One of those phone calls suggested that Booth, or someone else at his behest, had taken pictures at Mr. Clarkson's funeral and that Booth expressed what might be described as a morbid curiosity about seeing those pictures. The State also introduced photographs that were taken at the victim's funeral, either by Booth or by someone who took them on his behalf, and it was asserted that Booth laughed about them during the above-described telephone conversations, although Booth is correct that the recording is of poor quality. The other call suggested that Booth harbored an intent to kill whoever it was he was going to rob, if that became necessary. Although the record is otherwise silent about it, that call also suggested that there was another person "behind" the robbery but that he was the one who did the robbing and killing.

[¶ 16] In support of the imposition of a life sentence, Booth presented expert evidence which found much of its validation in the decision of the United States Supreme Court in *Roper v. Simmons,* 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (holding that the constitutional provision prohibiting cruel and unusual punishment commanded that persons under the age of 18 could not be subjected to capital punishment). In 2004, Wyoming had abolished the death penalty for persons under the age of 18. 2004 Wyo. Sess. Laws, ch. 29, § 1. Thus, Booth was subject to application of the death penalty, had the State opted to pursue that penalty, because he was over 45 days past his 18th birthday. Booth seeks to extend, somewhat, the arguments that prevailed in *Roper,* and in the Wyoming Legislature in 2004, by contending that his untreated drug addiction, his unstructured and abusive upbringing, and his lack of mental development and maturity counseled that he should not be subjected to LWOP either. Rather, he contends, the evidence of his experts counseled that a life sentence (with the possibility of commutation

to a term of years, and eventual parole) was the only appropriate penalty in this case. LWOP removes the possibility of parole, but it does not remove the potential for a gubernatorial pardon.

[¶ 17]   Berton J. Toews, M.D. (certified by the American Board of Family Practice and by the American Society of Addiction Medicine, and also a Wyoming Licensed Addiction Therapist) provided this information in an affidavit:

> 3.   That your affiant has reviewed parts of the record, and the mental evaluation by the State Hospital and personally interviewed Mr. Keith Booth.
>
> 4.   That Mr. Booth has a long term history of drug and alcohol problems, for which he has never received the appropriate treatment, which would have consisted of intensive long term residential and outpatient treatment.
>
> 5.   The murder of Mr. [Clarkson] was a single impulsive event that was predicated by drug use.
>
> 6.   Mr. Booth could benefit from placement in a positive therapeutic community to treat his drug addictions.
>
> 7.   It is inappropriate to make judgment in 2006, that Mr. Booth will not be able to be rehabilitated at some point in the future.
>
> 8.   Mr. Booth initially portrays a streetwise demeanor, but this is not an accurate representation of his emotional development.   He is emotionally immature, as a consequence of his drug and alcohol addictions and chaotic lifestyle.   It is entirely possible that a lengthy period of incarceration with quality treatment will eventually produce a rehabilitated individual.
>
> 9.   It is morally and scientifically unfounded to permanently prejudge his rehabilitation potential at this time.

[¶ 18]   Arthur N. Merrel, M.D., a psychiatrist, gave testimony in a similar vein.   The district court also had available to it a lengthy report from the Wyoming State Hospital that detailed the horrific nature of Booth's life, from birth until the day of his sentencing, although it also detailed the opportunities Booth had for treatment, including the two years at the Wyoming Boys School immediately preceding the murder. We note that Booth chose not to allocute on his own behalf during his sentencing.

[¶ 19]   In making its decision to hear the evidence offered by the State, the district court gave this reasoning:

> Based upon *Monjaras v. State* found [at] 136 P.3d 162, at 165, Wyoming 2006 Supreme Court decision, in assessing the reasonableness of the sentence, consideration to be given to the crime, and its circumstances, and the character of the criminal.
>
> In the passing upon sentencing today, I have to consider the crime and the circumstances as well as the history of Mr. Booth. I believe that the information may be relevant.
>
> At the time of the plea, there were discussions regarding what occurred and led to the events that gave rise to the death of Gregory Clarkson.   And in passing upon sentencing today, I believe that that information as proffered by the State is appropriate information for the State to—for the Court to consider.
>
> I'd also note under *Martinez v. State*, 128 P.3d 652, the Wyoming Supreme Court addressed that the Court could consider filed reports and information as long as the defendant is given an opportunity to deny, dispute, or disprove that information.
>
> In this case there was obviously notice provided by the State.   The items that are identified by the State and intended to be introduced were provided to the defendant, and it's not disputed as to their accuracy.
>
> So at this time I'll overrule the objection, and we'll proceed forward on the issues of sentencing.   I'll allow the presentation in accordance with the victim impact or at a time the State deems appropriate.

[¶ 20]   When the proceedings came to a close, the district court articulated its basis for imposing the LWOP sentence:

> Well, this is a tragic situation no matter which way I look at this case.   There has been the loss of a life in the form of Gregory Clarkson, a human being who will never walk the face of Earth as a result of the acts of Mr. Booth.

The question I'm faced with is whether Mr. Booth should have the opportunity to be considered for release or whether he should spend the rest of his days breathing the air of a penitentiary behind bars in a cell.

In passing upon this issue, the Court is mindful of the most recent pronouncement by the Wyoming Supreme Court in *Monjaras v. State* . . .

Assessing the reasonableness of a sentencing, consideration is to be given to the crime, the circumstances, the character of the criminal. In passing upon issues of sentencing in this matter, the Court must take into consideration the severity of the crime, the [intents] circumstances of that crime, and the character of the criminal, Mr. Booth, and his criminal history.

This Court would find the following significant in passing upon the sentence: Prior criminal history of Mr. Booth, as, Mr. Skaggs, you've noted is fairly limited in the sense of the time frame.

His criminal history began—at least in terms of records before this Court—with reckless endangering, public intoxication, interference, property destruction in 2003.

He eventually was revoked from his probation and sentenced to a term in the Boys School. He spent two years in that program, essentially; I think he went in in October of 2003 and was released in August, one week before this incident on August 18th. He was released on August 11th, 2005. One week later, he murdered Gregory Clarkson on August 18, 2005.

This Court would also note that in December of 2005, Mr. Booth was charged and pled guilty to a battery on a fellow inmate in which he was sentenced to serve 180 days in jail by the Circuit Court.

Mr. Booth's past reveals continued and repeated problems with abuse of alcohol beginning at age 11, controlled substances including marijuana at the age of 9, cocaine at the age of 14, and methamphetamine at the age of 16, which only serve to exacerbate the future and anxiety problems he's dealt with for most of his life.

The nature of the murder, it can only be classified as being atrocious and certainly [conscienceless].

The facts—and one of the reasons why I ruled the way I have with respect to the statement is because at the time of the plea in this matter, there was some issue as to what the events were in terms of Mr. Clarkson's death, whether there was a struggle resulting in the gun being discharged or during that struggle or whether this was a conscious act by the defendant.

That weight in terms of acceptance of responsibility in terms of this Court's evaluation, the record will reveal in the plea—change of plea, the defendant, Mr. Booth, stated that this was an accident, that it discharged in a fit of struggle. Certainly, the confession as given by the defendant on the day following this event on August 19, 2005, does not demonstrate that it was a struggle.

Rather, it demonstrates, sadly, that after emptying his pockets and after giving Mr. Booth every penny that he had, Mr. Booth wanted to escape and wanted to conceal his identity, so he was going to strike Mr. Clarkson and knock him out. When that didn't work the first time, he did it again. Mr. Clarkson then at some point in time apparently reached back and tried to defend himself and gave Mr. Booth a bloody lip for which Mr. Clarkson paid his life.

In response to that, Mr. Booth changed his position in the car, jacked a round in the chamber and then jacked one into the side of Mr. Clarkson's body, killing him. He didn't open the passenger door and leave after getting his money. He didn't have anyone forcing him to kill Mr. Clarkson. He made a choice, a deliberate choice.

Now, why did he make that choice? Was he high on meth? Yes. Was he raised in different families and foster care and abused physically and mentally during various times? Yes. But he made a choice, as sad as that choice is, it was one that was left to him. There was no one holding his hand.

Maybe it was a choice he wouldn't have made had he had a different upbringing or wasn't high on meth. But he made the choice to get high. And then he made the choice that he needed more, and for that a man has paid his life.

Gregory Clarkson has been deprived of his fundamental opportunity of life. He's been denied an opportunity to raise his children, to watch them attend school, or even tell them he loves them. He will no longer be able to write a song or sing a song to his family or his friends which they can hear. His untimely death has deprived his parents, his wife, his brothers, and sisters, and friends of his comfort and presence and love. His humor and care and musical talent will never be shared with these people through his voice or through a song heard.

The crime for which Mr. Booth has been convicted is a heinous crime. He selfishly and premeditated with malice removed from this world an innocent human being. I—I have no doubt, as I noted before, that Mr. Booth's methamphetamine binge influenced his poor choice.

I also have no doubt that the choices Mr. Booth has made were a product from the environment—of the environment from which he came.

You never knew your biological father. Your mother was a drug addict and alcoholic. You were bounced in and out of foster homes and ultimately abused by your adoptive parents. At the age of 13, you came to reside with your aunt, [name deleted], after being kicked—based upon your history, sadly, it is not any wonder you stand before me today.

I struggled until one o'clock this morning trying to figure out how this should end, what conclusions should be made to this case, whether I should conclude a life with or without the possibility of parole and a commutation.

And even as I sit here today, Mr. Skaggs, I pass judgment on a man and make a determination as to his future. What is his likelihood of rehabilitation? What is the likelihood that he will not commit this crime again?

Considering the history, considering all those factors, considering Dr. Merrell's testimony, Dr. Toews'—Paragraph 9 of his affidavit states that it is [morally] and scientifically unfounded to permanently prejudge his—Mr. Booth's—rehabilitation potential at this time.

Well, I guess morally and scientifically we can all have our judgments. I'm not learned in the science. Morally, I have an obligation sitting here to make that determination by Legislature.

While Mr. Booth's prior history can explain his heinous act, it does not excuse it. Each of us has to ultimately be responsible and be held accountable for the choices we make. No one forced Mr. Booth to get high, to put a gun to Gregory Clarkson's head or body and ultimately pull the trigger ending his innocent life. Mr. Booth made that choice.

And Mr. Booth's history is one that, absent institutionalization, he has demonstrated no ability or desire to abide by the rules of our society. He selfishly thought to satisfy his own needs at the expense of society's rules and ultimately at the expense of the life of another human being. Despite being given opportunities and assistance to change, he chose not to.

Mr. Merrell—you asked Dr. Merrell the question about likelihood of his engaging in rehabilitation and therapy, Mr. Skaggs.

And Mr. Merrell—Dr. Merrell was very forthright in the sense that his history does indicate that he may not but it's not determinative as to what likely will or will not occur.

I have no crystal ball. I have no way with certainty to determine anything in this case. But I have to look on the past and upon the history.

And what I have before me and having sifted through those reports and information provided, as well as hearing the arguments and the statements of counsel here today, the testimony of Dr. Merrell, and the exhibits as offered by the State, in an effort to discern whether you should be sentenced to life with or without the opportunity of parole, Mr. Booth, I can appreci-

ate the arguments given your age, family history, and the opportunity—that an opportunity should remain for you. And the sad reality is that by your selfish crime, Mr. Clarkson will never have the opportunity to sing a song or see his family again.

Considering all the sentencing options in this case including probation/parole and other options, given the circumstance and the choice, given the history, I cannot conclude that you should be given more opportunity than your victim, Gregory Clarkson, was given.

Based upon a careful consideration and examination of the Presentence Investigation Report, the information provided during the sentencing hearing, and having listened to the evidence and arguments of counsel and the recommendations, the victim impact statements, and the severity of this crime, its impact, and your history, the Court finds that you, Keith Jordan Booth, should be sentenced and hereby are sentenced to life without the opportunity of parole for the first-degree murder of Gregory Clarkson.

### Did the State Breach the Plea Agreement

[¶ 21] The plea agreement could best be described as "sketchy." Booth asks that we read—"delete the premeditation aspect of first-degree murder"—to encompass a conclusion that the prosecution could not offer evidence which suggested that Booth did anything other than accidentally fire the pistol during the course of the robbery. To be sure, it is evident that the State did not agree with that interpretation at the time defense counsel uttered the words he used to describe his understanding of the plea agreement, because the prosecutor stated that the operative language for consideration in the instant case was that Booth "unlawfully, knowingly, and purposely, in the perpetration of any robbery kill another human being...." It is, of course unfortunate, if not inexcusable, that a plea bargain of this magnitude, and in a case with such profoundly significant consequences, was not reduced to writing so that its perimeters could be better defined and understood. Based on the record extant, and applying the standard articulated in Frederick, we do not perceive that the State breached either the letter or the spirit of the plea agreement.

### CONCLUSION

[¶ 22] The judgment and sentence of the district court are affirmed.