2012 WY 16

**Wyatt L. BEAR CLOUD, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. S–11–0102.**

Supreme Court of Wyoming.

Feb. 9, 2012.

Representing Appellant: Diane Lozano, State Public Defender, PDP; Tina N. Olson, Appellate Counsel; Kirk A. Morgan, Senior Assistant Appellate Counsel. Argument by Mr. Morgan.

Representing Appellee: Gregory A. Phillips, Wyoming Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Jenny L. Craig, Senior Assistant Attorney General; Jeffrey S. Pope, Assistant Attorney General. Argument by Mr. Pope.

Before KITE, GOLDEN, HILL, and BURKE, JJ.; and DONNELL, D.J.

DONNELL, District Judge.

[¶ 1] On August 26, 2009, Appellant Wyatt Bear Cloud and two co-defendants were involved in the armed burglary of a residence in Sheridan, Wyoming. During the course of the burglary, one of Bear Cloud's co-defendants shot and killed one of the home's residents. Bear Cloud was charged with, and ultimately pleaded guilty to, *Murder in the First Degree (Felony–Murder)*, in violation of Wyo. Stat. Ann. § 6–2–101(a) (LexisNexis 2011); *Conspiracy to Commit Aggravated Burglary*, in violation of Wyo. Stat. Ann. §§ 6–1–303(a) and 6–3–301(a) and (c)(i) (LexisNexis 2011); and *Aggravated Burglary*, in violation of Wyo. Stat. Ann. § 6–3–301(a) and (c)(i) (LexisNexis 2011). He was sixteen years of age at the time of these offenses.

[¶ 2] In addition to his sentences on the burglary and conspiracy charges, Bear Cloud

was sentenced to life imprisonment for his conviction for felony-murder. He now appeals his convictions and sentences on numerous grounds. For the reasons set forth herein, we affirm Bear Cloud's convictions and sentences in their entireties.

## ISSUES

[¶ 3] Bear Cloud presents the following issues for review:

1. Was Appellant's trial counsel ineffective, specifically by: (A) inviting intrusion into the attorney-client relationship, (B) waiving his meritorious appellate issues and (C) incorrectly advising him of the consequences of his pleas, thus rendering his pleas involuntary?

2. Is a motion to transfer a case to juvenile court a dispositive motion, so it may be the subject of conditional guilty pleas?

3. Did the trial court abuse its discretion when it refused to transfer Appellant to juvenile court?

4. Does the sentence of life in prison for a juvenile who did not commit or intend to commit a homicide violate the [Eighth] Amendment of the United States Constitution?

5. Does the sentence of life in prison for a juvenile who did not commit or intend to commit a homicide violate Art. 1, § 14 of the Wyoming Constitution?

6. Does the prohibition against cruel and unusual punishment provided in the [Eighth] Amendment of the United States Constitution and Art. 1, § 14 of the Wyoming Constitution, prohibit the imposition of mandatory life imprisonment on a juvenile when the sentencing court cannot take into consideration the child's age, culpability or other mitigating factors?

7. Did the trial court abuse its discretion in denying Appellant's motion to withdraw his guilty pleas?

Appellee, the State of Wyoming, generally relies upon the same issues, albeit rephrasing them somewhat.

## BACKGROUND FACTS

[¶ 4] In the early morning hours of August 26, 2009, Bear Cloud, along with co-defendants, Dennis Poitra, Jr. and Dharminder Vir Sen, entered the home of Robert and Linda Ernst in Sheridan, Wyoming, with the intent to steal items from the home. During the commission of this burglary, Sen shot and killed Mr. Ernst. Bear Cloud was sixteen years of age; Sen, fifteen; and Poitra, eighteen, at the time.

[¶ 5] Previously, sometime between August 19–26, 2009, during meetings at Bear Cloud's residence, these three co-defendants had planned to commit a series of burglaries. They obtained weapons (a knife, a 9mm handgun, and a landscaping timber modified to be used as a bat) and a map, planned the location of the burglaries, obtained dark clothing and masks, and then waited until the early morning hours of August 26, 2009, to carry out their plans. In fact, during this planning phase and a few days prior to the murder, Bear Cloud and Sen broke into a pickup truck and stole the handgun that ultimately was used to kill Mr. Ernst.

[¶ 6] Early in the morning of August 26, 2009, the three donned black bandanas and dark clothing to hide their identities. After first attempting to burglarize another residence, they entered the Ernst home by having Poitra cut the window screen and enter the house. He then unlocked the door, thus permitting Bear Cloud and Sen to enter. Poitra was in possession of the handgun and the knife; Sen was in possession of the bat.

[¶ 7] Upon gaining entry to the home, the three proceeded to search the basement for items to steal. En route to the basement, they passed the master bedroom and observed Mr. and Mrs. Ernst asleep in their bed. After a period of time spent "rummaging around" the home, Sen obtained the handgun from Poitra, stating that he wanted to "intimidate" or "interrogate" Mr. Ernst so as to coerce him into opening a safe that the co-defendants located in the basement.

[¶ 8] All three co-defendants returned upstairs, at which time Poitra and Sen went into the Ernst bedroom with the intent to confront the Ernsts. Bear Cloud apparently

was on the same floor but not in the Ernst bedroom at the time. After shining flashlights into the Ernst bedroom to wake Mr. Ernst, Sen yelled something at Mr. Ernst and then shot him three times, killing him. The three then fled the home and returned to Bear Cloud's residence.

### PROCEDURAL HISTORY

[¶ 9] On August 27, 2009, the State filed an Information, charging Bear Cloud with one count of *Murder in the First Degree,* in violation of Wyo. Stat. Ann. § 6–2–101(a), and one count of *Conspiracy to Commit Aggravated Burglary,* in violation of Wyo. Stat. Ann. §§ 6–1–303(a) and 6–3–301(a) and (c)(i). On September 15, 2009, the State amended the Information to add, as an alternative to the first-degree murder charge, one count of *Accessory Before the Fact to First–Degree Murder,* in violation of Wyo. Stat. Ann. §§ 6–2–101(a) and 6–1–201, and to add one count of *Aggravated Burglary,* in violation of Wyo. Stat. Ann. § 6–3–301(a) and (c)(i).

[¶ 10] On October 27, 2009, Bear Cloud pleaded "not guilty" to all pending charges: Count I: *Murder in the First Degree (Felony Murder* ), in violation of Wyo. Stat. Ann. § 6–2–101(a); Count II: *Conspiracy to Commit Aggravated Burglary,* in violation of Wyo. Stat. Ann. §§ 6–1–303(a) and 6–3–301(a) and (c)(i); and Count III: *Aggravated Burglary,* in violation of Wyo. Stat. Ann. § 6–3–301(a) and (c)(i).

[¶ 11] On October 12, 2009, prior to his arraignment in the District Court, Bear Cloud filed a motion to transfer his case to juvenile court. That "transfer motion" was assigned to a different district court judge for consideration and was argued on May 19, 2010. After considering the evidence presented at the transfer hearing, the district court denied Bear Cloud's motion to transfer the case to juvenile court.

[¶ 12] On July 2, 2010, Bear Cloud filed a motion to suppress any statements he had made to law enforcement officers during two custodial interrogations. He asserted that

he had not been adequately advised of his *Miranda* rights and that his statements were involuntary. Following an August 10, 2010 hearing on the matter, the trial court denied the motion, ruling that Bear Cloud had received proper *Miranda* advisements and that his statements were voluntary.

[¶ 13] On September 8, 2010, Bear Cloud filed his notice of intent to enter a conditional guilty plea, seeking to preserve his right to appeal certain issues. However, the State refused to consent to the conditional guilty plea, asserting that the issues Bear Cloud sought to preserve for appeal were not dispositive of the case. *See Walters v. State,* 2008 WY 159, 197 P.3d 1273 (Wyo.2008). Because the State would not consent, and because the district court agreed that the stated issues were not dispositive, the court could not accept a conditional guilty plea. Instead, after consulting with counsel, Bear Cloud appeared before the district judge and entered guilty pleas to all three charges. These were "cold pleas," entered without a plea agreement with the State.

[¶ 14] On September 21, 2010, with the advice of new defense counsel, Bear Cloud filed a motion to withdraw his guilty pleas, claiming that the district court failed to comply with W.R.Cr.P. 11 and that his previous defense counsel had been ineffective in advising him to plead guilty. On November 30, 2010, the district court held a hearing, at which time it denied the motion.

[¶ 15] On February 9, 2011, the district court sentenced Bear Cloud to: (1) 20–25 years in prison on Count III (*Aggravated Burglary* ); (2) life in prison with the possibility of parole[1] on Count I (*First–Degree Murder* ), to be served consecutively to the sentence for aggravated burglary; and (3) 20–25 years in prison on Count II (*Conspiracy to Commit Aggravated Burglary* ), to be served concurrently with the first-degree murder sentence but consecutively to the aggravated burglary sentence. This appeal followed.

---

1. Wyo. Stat. Ann. § 6–2–101(b) refers to this sentence as "life imprisonment … according to law," specifically distinguishing it from "life imprisonment without parole." *Id.* This Court will use the phrase "life imprisonment according to law" interchangeably with the phrase "life with the possibility of parole" throughout this opinion.

## ANALYSIS

[¶ 16] In an attempt to best consider the issues raised by Bear Cloud on appeal, and because some of the issues presented are dispositive of others, this Court reorders them and addresses each as follows:

### I. Denial of Motion to Withdraw Guilty Plea

#### A. Standard of Review

■ [¶ 17] When a motion to withdraw a guilty plea is made before sentencing, W.R.Cr.P. 32(d) requires only "any fair and just reason" to grant the motion. It is the defendant's burden to show "any fair and just reason," and the burden shifts to the State to prove prejudice to its case only if the defendant first so demonstrates. *See McCard v. State*, 2003 WY 142, ¶ 11, 78 P.3d 1040, 1043 (Wyo.2003).

■ [¶ 18] Our review of the denial of a motion to withdraw a guilty plea, made pursuant to W.R.Cr.P. 32(d), and before sentencing, requires a two-part inquiry: First, this Court inquires as to whether the strictures of W.R.Cr.P. 11 were met and, second, whether the defendant intelligently, knowingly, and voluntarily entered the guilty plea. *See Kruger v. State*, 2012 WY 2, ¶ 25, 268 P.3d 248 (Wyo.2012). Overall, a trial court's denial of such a motion is reviewed for an abuse of discretion. *See id.; Demeulenaere v. State*, 2008 WY 147, 197 P.3d 1238 (Wyo. 2008). To that end, this Court must determine whether the trial court reasonably could conclude as it did and whether any facet of its ruling was arbitrary or capricious. *See Kruger*, ¶ 26, 268 P.3d at 254; *Ingersoll v. State*, 2004 WY 102, ¶ 12, 96 P.3d 1046, 1050 (Wyo.2004). However, the standard for determining the voluntariness of a guilty plea is *de novo*. *See Kruger*, ¶ 30, 268 P.3d at 255. Further, the denial of a motion to withdraw a guilty plea is subject to the following considerations when, as here, the request is made *prior to* sentence being imposed upon a defendant:

A defendant does not enjoy an absolute right to withdraw a plea of guilty prior to the imposition of sentence. *Osborn v. State*, 672 P.2d 777, 788 (Wyo.1983), *cert. denied*, 465 U.S. 1051, 104 S.Ct. 1331, 79 L.Ed.2d 726 (1984); *Ecker v. State*, 545 P.2d 641, 642 (Wyo.1976). The trial court is vested with discretion to determine whether to grant a motion to withdraw a plea of guilty made prior to sentencing, and it does not abuse that discretion by denying the withdrawal of the plea **so long as the requirements of W.R.Cr.P. 11 were complied with at the time the plea was accepted.** *Kaldwell v. State*, 908 P.2d 987, 990 (Wyo.1995). **Even when the defendant provides a plausible or just and fair reason for withdrawal of the plea of guilty, the denial of the defendant's motion does not amount to an abuse of discretion if the trial court conducted a careful hearing pursuant to W.R.Cr.P. 11 at which the defendant entered a plea or pleas of guilty that was knowing, voluntary, and intelligent.** *Osborn*, 672 P.2d at 778–79.

*Stout v. State*, 2001 WY 114, ¶ 8, 35 P.3d 1198, ¶ 8 (Wyo.2001) (quoting *Nixon v. State*, 4 P.3d 864, 868–69 (Wyo.2000)); and see *Becker v. State*, 2002 WY 126, ¶ 11, 53 P.3d 94, ¶ 11 (Wyo.2002)(for purposes of a review such as this, a plea of nolo contendere is functionally equivalent to a guilty plea).

■ This standard of review has been further refined as follows:

A motion to withdraw a guilty plea, such as that filed here, is governed by W.R.Cr.P. 32(d) which provides that if a motion for withdrawal of a guilty plea is made before sentence is imposed, the court may permit withdrawal upon a showing by the defendant of any fair and just reason. A defendant has no absolute right to withdraw a plea of guilty before sentence is imposed, and where the strictures of W.R.Cr.P. 11 have been met, and the defendant intelligently, knowingly, and voluntarily entered into his plea of guilty, the district court's decision to deny such a motion is within its sound discretion. *Burdine v. State*, 974 P.2d 927, 929–30 (Wyo.1999); 3 Charles Alan Wright, Federal Practice and Procedure: Criminal 2d § 538 (1982 and Supp. 2001). **Seven factors have**

been suggested as pertinent to the exercise of the court's discretion: (1) Whether the defendant has asserted his innocence; (2) whether the government would suffer prejudice; (3) whether the defendant has delayed in filing his motion; (4) whether withdrawal would substantially inconvenience the court; (5) whether close assistance of counsel was present; (6) whether the original plea was knowing and voluntary; and (7) whether the withdrawal would waste judicial resources. 3 Wright, Federal Practice and Procedure: Criminal 2d § 538 (Supp. 2001); *United States v. Black*, 201 F.3d 1296, 1299–1300 (10th Cir. 2000).

*Frame v. State*, 2001 WY 72, ¶ 7, 29 P.3d 86, ¶ 7 (Wyo.2001).

Furthermore, "[t]he findings of fact that led to denial of a motion to withdraw a guilty plea are subject to the clearly erroneous standard of review, while the decision to deny the motion is reversed only if it constituted an abuse of discretion." 3 Charles Alan Wright, Nancy J. King and Susan R. Klein, Federal Practice and Procedure: Criminal 2d § 538 (Supp. 2003).

*McCard v. State*, 2003 WY 142, ¶¶ 6–8, 78 P.3d 1040, 1042–43 (Wyo.2003).

*Demeulenaere*, ¶ 13, 197 P.3d at 1241 (quoting *Hirsch v. State*, 2006 WY 66, ¶ 14, 135 P.3d 586, 593 (Wyo.2006)) (emphasis added).

### B. *Denial of Bear Cloud's Request to Withdraw His Guilty Pleas*

[¶ 19] On September 8, 2010, Bear Cloud pleaded guilty to all three pending felony criminal charges against him. Thirteen days later, and with the assistance of new defense counsel, he filed a motion to withdraw his guilty pleas pursuant to W.R.Cr.P. 32,[2] asserting that he was not adequately informed by his defense counsel that "life without parole" was a possible consequence of his guilty pleas. He also faulted the district court for not adequately verifying

that he understood the ramifications of his pleas. After considering the evidence at a November 30, 2010 motion hearing, and addressing the seven factors discussed in *Frame, supra*, the district court denied Bear Cloud's request. Bear Cloud now asks this Court to conclude that the district court abused its discretion in so doing.

[¶ 20] To reach a conclusion on this claim of error, this Court first must review the proceedings at the *Change of Plea* hearing conducted by the district court on September 8, 2010, to determine whether the court complied with Rule 11. "Even if a "plausible" or a "just and fair" reason for withdrawal is presented, an abuse of discretion is not demonstrated if the requirements of Rule 11 have been met and the record clearly shows that the defendant intelligently, knowingly, and voluntarily entered the plea." *Kruger*, ¶ 36, 268 P.3d at 255 (quoting *Major v. State*, 2004 WY 4, ¶ 24, 83 P.3d 468, 479 (Wyo.2004)). At the change of plea hearing, Bear Cloud was present with defense counsel. Bear Cloud's father also was present, with a private attorney retained by the family. The court first addressed the non-conditional nature of Bear Cloud's intended change of pleas. Bear Cloud conceded that his potentially-preserved issues regarding the denial of his suppression motion and the exclusion from the public from the transfer hearing were not dispositive and, thus, could not be preserved for appeal by a conditional plea. However, he argued that the denial of his motion to transfer his case to juvenile court was dispositive and should be preserved, to which the State objected. The district court concluded that the denial of the transfer to juvenile court was not a dispositive issue and, as a result, the State had appropriately refused consent to a conditional plea. The court then addressed Bear Cloud and inquired as to his competence to enter his guilty pleas on that date. Additionally, the court specifically engaged in the following colloquy:

THE COURT: ... You understand that it leaves only the sentencing, which is in the

---

**2.** W.R.Cr.P. 32(d) provides: "If a motion for withdrawal of a plea of guilty or nolo contendere is made before sentence is imposed, the court may permit withdrawal of the plea upon a show-ing by the defendant of any fair and just reason. At any later time, a plea may be set aside only to correct manifest injustice."

discretion of the Court. You will not be allowed to withdraw your guilty plea if you do not like the sentence that may be imposed. Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: I was advised in Chambers that this change of plea is not pursuant to a plea agreement. Is that correct?

THE DEFENDANT: Yes, Your Honor.

. . . .

THE COURT: You have had an arraignment many months ago. The law does not require me to go over the mandatory minimum or maximum sentences a second time, but it is important that you understand what they are. Do you recall those and have you had opportunity to visit with your attorney about them?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Would you like me to go over them a second time with you?

THE DEFENDANT: No, Your Honor.

THE COURT: Do you have any questions of the Court whatsoever before I allow you to change your pleas?

THE DEFENDANT: No, Your Honor.

At this point, the district court permitted Bear Cloud to enter his guilty pleas and verified, once again, that he understood the nature and consequences of those pleas after having had the opportunity to consult with defense counsel. The district court expressly inquired of Bear Cloud whether he was entering into his pleas "freely and voluntarily." To every inquiry, Bear Cloud responded affirmatively.

 In his motion to withdraw his guilty plea, Bear Cloud asserted, as his chief complaint, that he did not, in fact, understand that he faced a *potential* sentence of life without the possibility of parole. Yet, at the motion hearing, he expressly testified that, about a month before he actually entered his guilty pleas, it was he, not defense counsel, who first proposed the notion of pleading guilty to the charges. He testified that he was "told that [he] potentially could face life without parole[.]" Bear Cloud also conceded that, about one week prior to the

change of plea hearing, he was advised, by defense counsel, that his maximum potential sentence could consist of life imprisonment without parole, plus two consecutive sentences and that he "would never, ever get out again." Despite this accurate information, he asserted at the hearing that he was unclear on the practical consequences of his guilty pleas, believing that he would be released from incarceration at *some* future date. Bear Cloud further asserted he "mostly" did not understand the questions from and statements made by the district court during the change of plea hearing but proceeded with his guilty pleas because he "wanted to get on with it and get on to sentencing."

[¶ 22] At the motion hearing, defense counsel also testified as to having discussed the potential sentences that could be imposed on Bear Cloud and denied giving him any "guarantees" regarding the sentence that the court would impose. Counsel expressed a "personal belief" that Bear Cloud would be released from prison some day, recognizing there was no guarantee that event would occur. Counsel even testified as to conversations with Bear Cloud about "what he needed to do while he was in prison that would put him in a good light to get those type of treatments [to assist with commutation of his life sentence by the Governor]."

[¶ 23] After considering the evidence presented at the hearing on the motion to withdraw Bear Cloud's guilty plea and the seven *Frame* factors, the district court concluded that "there has been an insufficient showing by the Defendant to establish a fair and just reason for the withdrawal of the plea before sentencing[.]" The district court, in considering the first *Frame* factor, noted that Bear Cloud had not asserted, and was not asserting, his innocence. Rather, his complaint lay in the "cold" nature of his guilty pleas, absent any sentencing recommendation by the State. Defense counsel went so far as to concede: "If we were in a position where there was a life [sentence with the possibility of parole] and that was the agreement, I wouldn't be standing here[.]"[3] Second, while

3. Interestingly, at the motion hearing, Bear

Cloud focused on the fact that, because "life

the State undoubtedly would suffer some prejudice, at least in the sense that it might be forced to try the case, the district court did not find that prejudice to be particularly high. Third, Bear Cloud had filed his motion in a timely fashion, only thirteen days after he entered his guilty pleas. Fourth, the district court noted that a jury trial would inconvenience the court but did not weigh that factor heavily given the gravity of the case. Fifth, the court found that Bear Cloud had been afforded "close assistance of counsel," noting that defense counsel historically had been competent and capable in dealings with the court. Sixth, the district court noted its review of the transcript from the change of plea hearing and concluded that Bear Cloud's guilty pleas were knowing and voluntary. The court remarked that defense counsel "clearly" knew the implications of Bear Cloud's guilty pleas and adequately consulted with him about the situation. Although Bear Cloud, as well as his counsel, personally believed he ultimately would be

released from incarceration at some unknown future date, the district court did not find this optimism to equate to the entry of an involuntary or unknowing plea. Finally, the court found that the withdrawal of Bear Cloud's guilty pleas would waste judicial resources but found this factor not to be particularly compelling.

[¶ 24] This Court is charged with determining whether the district court abused its discretion in denying Bear Cloud's motion to withdraw his guilty plea. While recognizing that the standard for permitting a pre-sentence withdrawal of a guilty plea requires only a "fair and just reason," *see* W.R.Cr.P. 32(d), this Court also notes that a defendant does not enjoy an absolute right to withdraw his plea. *See Osborn v. State,* 672 P.2d 777, 788 (Wyo.1983), *cert. denied,* 465 U.S. 1051, 104 S.Ct. 1331, 79 L.Ed.2d 726 (1984); *Ecker v. State,* 545 P.2d 641, 642 (Wyo.1976). Here, during the change of plea hearing, the district court complied with W.R.Cr.P. 11[4] in

without parole" remained a sentencing possibility, he should be permitted to withdraw his guilty plea because he was in no better a position than if he proceeded to trial. He suggested that, had he made a plea agreement with the State whereby "life without parole" was removed as a sentencing option, he would have been satisfied with his decision to enter guilty pleas. Ultimately, Bear Cloud did *not* receive a "life without parole" sentence and yet, despite the lack of prejudice to him, he now argues that the denial of his motion to withdraw his guilty plea was an abuse of the district court's discretion.

4. W.R.Cr.P. 11 provides, in part:

(b) *Advice to Defendant.*—Except for forfeitures on citations (Rule 3.1) and pleas entered under Rule 43(c)(2), before accepting a plea of guilty or nolo contendere to a felony or to a misdemeanor when the defendant is not represented by counsel, the court must address the defendant personally in open court and, unless the defendant has been previously advised by the court on the record and in the presence of counsel, inform the defendant of, and determine that the defendant understands, the following:

(1) The nature of the charge to which the plea is offered, the mandatory minimum penalty provided by law, if any, and the maximum possible penalty provided by law and other sanctions which could attend a conviction including, when applicable, the general nature of any mandatory assessments (such as the surcharge for the Crime Victim Compensation Account), discretion-

ary assessments (costs, attorney fees, restitution, *etc.*) and, in controlled substance offenses, the potential loss of entitlement to federal benefits. . . .

(2) The defendant has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent the defendant;

(3) The defendant has the right to plead not guilty or to persist in that plea if it has already been made, the right to be tried by a jury and at that trial the right to the assistance of counsel, the right to confront and cross-examine adverse witnesses, the right to court process to obtain the testimony of other witnesses, and the right against compelled self-incrimination;

(4) If a plea of guilty or nolo contendere is accepted by the court there will not be a further trial of any kind, so that by pleading guilty or nolo contendere the defendant waives the right to a trial; and

(5) If the court intends to question the defendant under oath, on the record, and in the presence of counsel, about the offense to which the defendant has pleaded guilty, that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

(c) *Waiver of Advisements.*—A misdemeanor defendant represented by counsel may waive the advisements required in subdivision (b).

(d) *Insuring That Plea Is Voluntary.*—The court shall not accept a plea of guilty or nolo contendere without first, by addressing the defendant personally in open court, determining that the

every respect and, therefore, cannot be found to have abused its discretion in denying Mr. Bear Cloud's request to withdraw that plea. *See Kaldwell v. State,* 908 P.2d 987, 990 (Wyo.1995) (discussing the court's discretion in motions to withdraw guilty pleas).

[¶ 25] Although the district court complied with Rule 11's requirements, this Court still considers, *de novo,* the totality of the circumstances to determine the voluntariness of the guilty plea. *See Kruger,* ¶ 30, 268 P.3d at 254–55. Here, the district court affirmatively inquired of Bear Cloud whether his guilty pleas were knowing, voluntary, and intelligent. That Bear Cloud later contended that he did not truly understand the potential sentencing outcomes or that he just wanted to "get on with it" does not negate the district court's attempts to ensure the constitutionality of the pleas or Bear Cloud's testimony that he was accurately advised of the extent of possible consequences of a guilty plea. To allow a defendant to later assert that his pleas were unknowing or involuntary, despite his earlier assurances to the court to the contrary, would negate the Rule 11 process entirely and support the perpetration of fraud on the court.

[¶ 26] Even given the testimony and evidence at the hearing on the motion to withdraw Bear Cloud's guilty plea, the district court was justified in concluding that he intelligently, knowingly, and voluntarily entered his pleas of guilty. The district court appropriately weighed the seven *Frame* factors, placing particular emphasis on the voluntary and knowing nature of Bear Cloud's pleas. Although Bear Cloud later contended that he did not truly understand the ramifications of his plea, his own testimony at the hearing on the motion to withdraw the guilty plea belies that argument in that he conceded his knowledge of a potential sentence of life without possibility of parole. Where a plea of guilty is entered by "one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel," it is

considered knowing and voluntary and "must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes)." *Major,* ¶ 11, 83 P.3d 468 at 472. There simply is no credible evidence that Bear Cloud was induced by threats, misrepresentation, or improper promises made by the court, the prosecutor, or his own counsel, to plead guilty. Bear Cloud's plea, under the totality of the circumstances, was knowing and voluntary. Recognizing that findings of fact that lead to the denial of a motion to withdraw a guilty plea are subject to the "clearly erroneous" standard, this Court concludes that the district court could have rationally concluded as it did—that Bear Cloud did not present any "fair and just reason" to withdraw his guilty plea. The district court did not err in finding that Bear Cloud's guilty pleas were knowingly, intelligently, and voluntarily made nor did it abuse its sound discretion in refusing to allow the withdrawal of his guilty plea.

## II. *Denial of Motion to Transfer to Juvenile Court*

[¶ 27] Bear Cloud next seeks a reversal of the district court's denial of his motion to transfer his case to juvenile court. Having concluded that the district court did not abuse its discretion in denying his motion to withdraw his guilty pleas, Bear Cloud is permitted to appeal only jurisdictional issues. Accordingly, before reaching the substantive merits of the issue, this Court must determine whether the district court's denial of the request to transfer the case to juvenile court is, in fact, a jurisdictional issue.

### A. *Jurisdictional Nature of a Motion to Transfer to Juvenile Court*

[¶ 28] "By entering an unconditional guilty plea, [Bear Cloud] admitted all of the essential elements of the crime and

plea is voluntary and not the result of force or threats or of promises apart from a plea agreement. The court shall also inquire as to whether the defendant's willingness to plead

guilty or nolo contendere results from prior discussions between the attorney for the state and the defendant or the defendant's attorney.

waived appellate review of all non-jurisdictional defenses to his conviction." *Jones v. State,* 2011 WY 115, ¶ 6, 256 P.3d 536, 539 (Wyo.2011) (citation omitted). The only claims that remain are those that go to the jurisdiction of the court or the voluntariness of the plea. *Id.* (citing *Wilson v. United States,* 962 F.2d 996, 997 (11th Cir.1992)).

> Examples of jurisdictional defects are unconstitutionality of the statute defining the crime, failure of the indictment or information to state an offense, and double jeopardy. Non-jurisdictional defects include the use of inadmissible evidence, the use of unlawfully obtained statements, a claim that a grand jury was improperly convened and conducted, and a claim of violation of the right to speedy trial.

*Taylor v. State,* 2003 WY 97, ¶ 11 74 P.3d 1236, 1239 (Wyo.2003) (quoting *Kitzke v. State,* 2002 WY 147, ¶ 9, 55 P.3d 696, 699 (Wyo.2002)).

[¶ 29] The State argues that the potential transfer of Bear Cloud's case to juvenile court is *not* a jurisdictional matter in that it results only in a change of forum. Essentially, the case against Bear Cloud would have resumed, but in the juvenile court. In contrast, Bear Cloud relies on the premise that "[p]roceedings in juvenile court are equitable as opposed to being criminal. Juveniles are not convicted; they are merely adjudicated delinquents." *In re WJH,* 2001 WY 54, ¶ 10, 24 P.3d 1147, 1151 (Wyo.2001) (internal quotations omitted).

[¶ 30] Indeed, juvenile delinquency proceedings are *not* criminal prosecutions. *Id.* And, if the case against Bear Cloud had been transferred to juvenile court, the *criminal* case against him would have terminated. This Court has stated that conditional guilty pleas will be allowed only when "the decision of the appellate court . . . will dispose of the case either by allowing the plea to stand or by such action as compelling dismissal of the [charges] or suppressing essential evidence." *Walters,* ¶ 15, 197 P.3d at 1278–79. Simply put, the question is whether the preserved issue on appeal would "dispose of the case." *Id.,* ¶¶ 15–18, 197 P.3d at 1277–78.

> The essential problem created by use of the conditional guilty plea when the issues

reserved are not dispositive is that further judicial proceedings will be required if the defendant prevails on appeal. In that situation, upon remand, the defendant will be entitled to withdraw the plea. At that point, the defendant may then enter another guilty plea or proceed to trial. In either case, the proceeding may result in another appeal and further delay. If the defendant opts for trial, the ability of both parties to present their case may be compromised. The delay may be more significant to the government because it bears the burden of proof. Use of the conditional guilty plea, when the issues reserved are not dispositive, " 'only serve[s] to postpone the trial and require the government to try the case after substantial delay, during which time witnesses may be lost, memories dimmed, and the offense grown so stale as to lose jury appeal.' " *Bouch* [*v. State*], ¶ 28, 143 P.3d [643] at 652 [ (Wyo.2006) ] (quoting F.R.Cr.P. 11, Notes of Advisory Committee on Rules, 1983 Amendment).

Use of the conditional guilty plea when the reserved issues are not dispositive may also negatively impact appellate review. Proper appellate review requires an adequate factual record. It is important that the issues presented to this Court be "capable of disposition on a pretrial record." [*U.S. v.*] *Bundy,* 392 F.3d [641] at 646 [ (4th Cir.2004) ]. The factual record is particularly important when we attempt a harmless error analysis. If an appellate court finds error in a pretrial ruling, it may not be able to determine whether the error is harmful. "Permitting conditional guilty pleas to preserve non-case-dispositive pretrial issues for appeal would undermine harmless-error analysis." *Id.* at 647.

These concerns compel us to enforce compliance with W.R.Cr.P. 11(a)(2) in this case. The dispositive issue rule minimizes the risks of unnecessary trial and appellate litigation and avoids the possibility of appellate courts deciding appeals without an adequate record. Moreover, we agree with the following statement by the *Bundy* court:

> [W]e believe it is the duty of the [trial] court in the first instance "to ensure that

the defendant reserves only issues that can adequately be reviewed without a full trial record, resolution of which by this court would dispose of the case."

... A [trial] court should reject any conditional guilty plea that purports to preserve for appellate review pretrial issues that, in the [trial] court's own judgment, are not fully case-dispositive.

392 F.3d at 647. **An issue is dispositive if (1) an appellate ruling in the defendant's favor would require dismissal of the charges or suppression of evidence necessary for conviction, or (2) where an appellate ruling in the State's favor would require affirming the conviction.** *Id.* at 648. The State's assessment of the case has considerable weight, but the ultimate decision belongs to the trial court. The question for the court is whether the appeal will end the case. *Id.*

*Walters*, ¶¶ 19–21, 197 P.3d at 1278–79 (emphasis added).

[¶ 31] Here, a ruling in Bear Cloud's favor that the district court *should have* transferred the matter to juvenile court necessarily would result in dismissal of the criminal charges against him. Although juvenile proceedings almost certainly would result, the test is not whether there would be *some consequence* to Bear Cloud, or whether the State would have *other* avenues of relief, but whether the criminal charges against Bear Cloud would be dismissed. Obviously, such would have been the case had the matter been transferred to the juvenile court. Additionally, the issue of whether transfer to juvenile court was appropriate can adequately be reviewed by this Court on appeal and does not undermine the "harmless error" analysis. This Court concludes that the denial of a motion to transfer to juvenile court is a jurisdictional issue and must be addressed on its merits despite Bear Cloud's guilty pleas.

**B. *Denial of Transfer of Bear Cloud's Case to Juvenile Court***

■ [¶ 32] In Wyoming, a case in which the defendant has attained the age of fourteen years and is charged with a "violent felony" may be commenced either in juvenile court or in the district court. *See* Wyo. Stat. Ann. § 14–6–203(f)(iv) (LexisNexis 2011). Regardless of whether the matter is initiated in the juvenile court or the district court, the court may order the transfer of the proceedings to another court having jurisdiction. *See* Wyo. Stat. Ann. § 14–6–237 (LexisNexis 2011). A district court's decision to transfer a matter to juvenile court is reviewed for an abuse of discretion. *See Rubio v. State,* 939 P.2d 238, 241 (Wyo.1997).

[¶ 33] A determination to transfer proceedings commenced in district court to juvenile court is governed by the factors enumerated in Wyo. Stat. Ann. § 14–6–237(b):

(b) The court shall order the matter transferred to the appropriate court for prosecution if after the transfer hearing it finds that proper reason therefor exists. The determinative factors to be considered by the judge in deciding whether the juvenile court's jurisdiction over such offenses will be waived are the following:

(i) The seriousness of the alleged offense to the community and whether the protection of the community required waiver;

(ii) Whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner;

(iii) Whether the alleged offense was against persons or against property, greater weight being given to offenses against persons especially if personal injury resulted;

(iv) The desirability of trial and disposition of the entire offense in one (1) court when the juvenile's associates in the alleged offense are adults who will be charged with a crime;

(v) The sophistication and maturity of the juvenile as determined by consideration of his home, environmental situation, emotional attitude and pattern of living;

(vi) The record and previous history of the juvenile, including previous contacts with the law enforcement agencies, juvenile courts and other jurisdictions, prior periods of probation to this court, or prior commitments to juvenile institutions;

(vii) The prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile (if he is found to have committed the alleged offense) by the use of procedures, services and facilities currently available to the juvenile court.

[¶ 34] Here, the district court was briefed by the parties and heard evidence during the transfer hearing. In particular, the court heard testimony from Bear Cloud's juvenile probation officer, who testified that Bear Cloud had been expelled from school for willful disobedience and was on probation with the truancy program at the time he was arrested. Although Bear Cloud had failed to comply with numerous program requirements, the probation officer commented that Bear Cloud "did well on probation[.]" The court also heard evidence from a speech and language pathologist and a psychologist who testified that Bear Cloud tested at the "receptive vocabulary" level of a thirteen year-old and at the "problem solving" level of an eleven year-old. He possessed developmentally appropriate social-language skills, but his language competence was that of a ten year-old. Still, Bear Cloud showed no learning disabilities or frontal lobe problems and was of "average intelligence." Finally, Bear Cloud exhibited signs of drug and alcohol dependence, oppositional defiant disorder, adolescent anti-social behavior, and an adjustment disorder. The court also heard testimony regarding the nature of the charged crimes and Bear Cloud's participation in the planning and execution of them. Law enforcement officers also testified that, during his interview, Bear Cloud made an unsolicited statement that the Ernsts were "lucky that he did not have the handgun because he would have shot Mrs. Ernst, picked up the shell casings, and burned down the house."

[¶ 35] After hearing all of the evidence, the district court considered the above-quoted statutory factors and found that they weighed against transferring the matter to juvenile court. The court considered (1) the seriousness of the offenses; (2) that the murder was committed in a violent manner, even though Bear Cloud did not fire the weapon himself; (3) that the murder was committed against a person, and that this was not just a property crime; and (4) that the co-defendants also were being tried in "adult court." The court also considered Bear Cloud's previous juvenile history and contact with law enforcement, and his prior failure to complete probation. The district court noted that there could be no more serious offense, not only in the way it was conducted but in the manner in which it was intricately planned in advance. And, the court found that, although Bear Cloud possessed diminished problem-solving and critical thinking skills, those factors paled in light of the maturity and sophistication exhibited in carrying out the planned burglaries. The court considered Bear Cloud's minor criminal record and his notable juvenile record, focusing on his "spotty compliance" with court orders. Finally, the court expressed its concerns about adequately protecting society from the types of offenses that Bear Cloud was accused of committing, commenting on his statements about what he would have done had he been in possession of the firearm. While the court specifically recognized that greater rehabilitative services were available to Bear Cloud through the juvenile court, the court had reservations about the likelihood of rehabilitation. Considering, as a whole, the factors of Wyo. Stat. Ann. § 14–6–237(b), the district court concluded that Bear Cloud's case should remain in the district court.

[¶ 36] This Court does not find an abuse of discretion on the part of the district court in reaching that conclusion. The district court's thoughtful analysis demonstrated that it exercised appropriate judicial discretion in denying a transfer to juvenile court. The court thoroughly considered the evidence and argument presented to it, giving suitable weight to Bear Cloud's lack of sophistication and maturity. While Bear Cloud may assert that the court *should have* weighed the evidence differently, that function belongs to the trial court and will not be disturbed absent an abuse of discretion. *See Hansen v. State,* 904 P.2d 811, 828 (Wyo.1995). Quite frankly, it is hard to conceive that a district court would conclude that Bear Cloud's case would be better resolved in juvenile court given the particularly unique and egregious nature of the crimes involved. Despite the

fact that the district court heard some evidence that Bear Cloud might benefit from additional rehabilitative treatment, there was ample evidence by which the court could conclude that juvenile court rehabilitative measures would not be efficacious. Taken together with the other statutory considerations, this Court concludes that the district court did not abuse its discretion in denying Bear Cloud's request to transfer proceedings to juvenile court.

## III. *Ineffective Assistance of Trial Counsel*

[¶ 37] Bear Cloud's next claim of error is that his trial counsel was ineffective on several grounds.

### A. *Standard of Review*

[¶ 38] In the particular circumstances, as here, where a defendant has entered a guilty plea, this Court has summarized the following standards applicable to an assertion of ineffective assistance of trial counsel:

> We recently set forth in detail our standard for reviewing claims of ineffective assistance of counsel and, in particular, the specialized test for claims of ineffectiveness where the entry of a guilty plea is challenged:

> Wyoming has a well-established and oft-repeated standard for reviewing claims of ineffective assistance of counsel:

>> "When reviewing a claim of ineffective assistance of counsel, the paramount determination is whether, in light of all the circumstances, trial counsel's acts or omissions were outside the wide range of professionally competent assistance. *Herdt v. State,* 891 P.2d 793, 796 (Wyo. 1995); *Starr v. State,* 888 P.2d 1262, 1266–67 (Wyo.1995); *Arner v. State,* 872 P.2d 100, 104 (Wyo.1994); *Frias v. State,* 722 P.2d 135, 145 (Wyo.1986). The reviewing court should indulge a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Herdt,* at 796; *Starr,* at 1266; *Arner,* at 104; *Strickland v. Washington,* 466 U.S. 668, 689,

104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984).

>> **Under the two-prong standard articulated in *Strickland* and *Frias,* an appellant claiming ineffective assistance of counsel must demonstrate on the record that counsel's performance was deficient and that prejudice resulted.** *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064; *Starr,* at 1266; *King v. State,* 810 P.2d 119, 125 (Wyo.1991) (Cardine, J., dissenting); *Campbell v. State,* 728 P.2d 628, 629 (Wyo.1986); *Frias,* 722 P.2d at 145. In other words, to warrant reversal on a claim of ineffective assistance of counsel, an appellant must demonstrate that his counsel failed to 'render such assistance as would have been offered by a reasonably competent attorney' and that 'counsel's deficiency prejudiced the defense of [the] case.' *Lower v. State,* 786 P.2d 346, 349 (Wyo.1990). 'The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' *Strickland,* 466 U.S. at 686, 104 S.Ct. at 2064.'

> *Chapman v. State,* 2001 WY 25, ¶ 6, 18 P.3d 1164, 1168–69 (Wyo.2001) (*quoting Grainey v. State,* 997 P.2d 1035, 1038–39 (Wyo.2000)). This test has been specialized for cases where entry of a guilty plea is challenged on the basis of ineffective assistance of counsel:

>> **When an attorney has allegedly misadvised his client with respect to the entry of a guilty plea, a determination must be made of whether the decision to plead and forego the defense of his case resulted in prejudice to the client. That determination involves two interrelated questions: whether, in the absence of counsel's error, the recommendation of a reasonably competent attorney concerning the plea would differ from that given; and, whether, absent the error, the outcome of a trial would have been more advantageous to the client than the result of his plea.** *Hill* [*v. Lockhart*], 474 U.S. [52] at 59–60, 106 S.Ct. [366] at

370–71 [88 L.Ed.2d 203 (1985) ]. The defendant may also establish the necessary prejudice by proof of circumstances indicating that, in deciding whether or not to plead guilty, he placed special emphasis on the challenged aspect of his attorney's advice. He must suggest to the reviewing court a plausible reason why, had his representation been as he claims it should have been, he would have chosen to forsake the benefits of his plea agreement for the risks of trial. *Id.; see also Worthen* [*v. Meachum*], 842 F.2d [1179] at 1184 [ (10th Cir.1988) ].

*Lower v. State,* 786 P.2d 346, 349 (Wyo. 1990); *see also Brock v. State,* 981 P.2d 465, 469 (Wyo.1999). The burden of proving that counsel was ineffective rests on the appellant. *Sorensen v. State,* 6 P.3d 657, 660 (Wyo.2000), *cert. denied,* 531 U.S. 1093, 121 S.Ct. 818, 148 L.Ed.2d 702 (2001) (*quoting Frias v. State,* 722 P.2d 135, 145 (Wyo.1986)).

*Becker v. State,* 2002 WY 126, ¶ 12, 53 P.3d 94, 98–99 (Wyo.2002) (quoting *Reyna v. State,* 2001 WY 105, ¶ 19, 33 P.3d 1129, 1134–35 (Wyo.2001)) (emphasis added).

### B. *Bear Cloud's Ineffective Assistance of Counsel Claims*

[¶ 39] Bear Cloud has asserted that his trial counsel was ineffective in three ways: (a) inviting intrusion into the attorney-client relationship by seeking assistance from another attorney; (b) waiving his meritorious appellate issues; and (c) incorrectly advising him of the consequences of his guilty pleas, thus rendering his pleas involuntary. All three claims can be disposed of fairly quickly.

■ [¶ 40] As to Bear Cloud's first two claims of ineffective assistance of trial counsel, those non-jurisdictional claims were waived by the voluntary entry of Bear Cloud's guilty pleas. This Court has noted:

> With regard to claims of ineffective assistance of counsel occurring prior to the defendant's guilty plea, the only ineffective assistance of counsel claims that survive [a defendant's] guilty pleas are claims directly related to the voluntariness of the pleas entered:

> [W]here a defendant has entered a guilty plea, he may challenge his subsequent conviction on appeal only with respect to matters which affect the voluntariness of his plea or the subject-matter jurisdiction of the trial court. *Zanetti v. State,* 783 P.2d 134, 137–38 (Wyo.1989). When a guilty plea has been entered upon the advice of counsel, the voluntariness of that plea may depend on the extent to which that advice comports with the constitutional guarantee to the effective assistance of counsel.

*Floyd v. State,* 2006 WY 135, ¶ 13, 144 P.3d 1233, 1235–36 (Wyo.2006) (quoting *Lower v. State,* 786 P.2d 346, 348–49 (Wyo.1990)).

■ [¶ 41] Neither an assertion that defense counsel erred by seeking the advice of another attorney nor that counsel erred in waiving Bear Cloud's "meritorious" appellate issues are directly related to the voluntariness of his guilty pleas. "A guilty plea ... simply renders irrelevant those constitutional violations not logically inconsistent with the valid establishment of factual guilt and which do not stand in the way of conviction if factual guilt is validly established." *Floyd,* ¶ 13, 144 P.3d at 1239 (internal citations omitted). *See generally Davila v. State,* 831 P.2d 204, 206 (Wyo.1992) (examples of non-jurisdictional defects waived by a guilty plea include use of inadmissible evidence and claim of violation of the right to speedy trial).

■ [¶ 42] With respect to his third allegation, regarding the allegedly improper advisement as to the consequences of his guilty plea, that issue is resolved by looking to the "prejudice prong" of the test rearticulated in *Reyna, supra.* At the hearing on his motion to withdraw his guilty pleas, Bear Cloud did *not* assert his innocence or that he would be successful at trial; he did *not* contend that he had suffered prejudice beyond the *possibility* of facing a sentence of "life without parole." Indeed, Bear Cloud's only reason for seeking to withdraw his guilty pleas was his argument that he should have negotiated a plea agreement with the State to remove the potential for "life without possibility of parole" as a sentencing alternative to his felony-murder charge. At the motion hearing, his counsel specifically stated:

> If we were in a position where there was a life [sentence *with* possibility of parole]

and that was the agreement, I wouldn't be standing here, because I understand the risk involved, but that's not where we're at.

▮ [¶ 43] Ultimately, Bear Cloud received the very sentence he sought and, notably, the *least severe* sentence statutorily available to him: life *with* the possibility of parole. Bear Cloud cannot now argue that he was prejudiced by his trial counsel's failure to advise him of those potential consequences of his guilty pleas or that he was prejudiced by the imposition of a harsher sentence. There was, in fact, no actual prejudice to him. And, "[if] we conclude that a defendant fails to satisfy the prejudice prong, we need not address the performance of counsel prong[.]" *Floyd*, ¶ 13, 144 P.3d at 1238.

[¶ 44] Finally, in any event, the record supports a conclusion that trial counsel did, in fact, advise Bear Cloud of *all* of the possible consequences of entering a guilty plea and had specific, strategic reasons why she believed it to be in his best interests to enter his guilty pleas (e.g. that he might gain some leniency by taking responsibility for his actions and also that it would spare the trial judge from hearing additional, negative information about Bear Cloud that might affect his sentencing decision). This Court cannot conclude that Bear Cloud has demonstrated ineffective assistance of defense counsel as to this claim. Bear Cloud's claims of ineffective assistance of trial counsel must fail.

## IV. *Constitutional Challenges: Violation of Eighth Amendment of the United States Constitution or Article 1, § 14 of the Wyoming Constitution* [5]

[¶ 45] Bear Cloud argues that a life sentence, imposed under Wyo. Stat. Ann. § 6–2–101(b), for a juvenile convicted of felony-murder, violates the Eighth Amendment of the United States Constitution and/or Article 1, § 14 of the Wyoming Constitution where that juvenile did not commit or intend to commit a homicide. He does not assert that a life sentence is *per se* unconstitutional on its face but, rather, that such a sentence is categorically unconstitutional "as applied" to juveniles and, even more specifically, "as applied" to juveniles who are "mere accomplices" to a homicide.

### A. *Standard of Review*

▮ [¶ 46] When the constitutionality of a statute is challenged, this Court applies the following standard of review:

> Issues of constitutionality present questions of law. We review questions of law under a *de novo* standard of review and afford no deference to the district court's determinations on the issues. *Anderson v. Bommer,* 926 P.2d 959, 961 (Wyo.1996). In reviewing a constitutionally based challenge to a statute, we presume the statute to be constitutional and any doubt in the matter must be resolved in favor of the statute's constitutionality. *Thomson v. Wyoming In-Stream Flow Committee,* 651 P.2d 778, 789–90 (Wyo.1982). [Appellant] bears the burden of proving the statute is unconstitutional. *Pfeil v. Amax Coal West, Inc.,* 908 P.2d 956, 961 (Wyo.1995).

Normally, this burden is "heavy" in that appellant must " 'clearly and exactly show the unconstitutionality beyond any reasonable doubt.' " *Michael v. Hertzler,* 900 P.2d 1144, 1146 (Wyo.1995) (*quoting Miller v. City of Laramie,* 880 P.2d 594, 597 (Wyo. 1994)).

---

5. When asked about the practical application of his request, appellate counsel was unable to explain the precise nature of his suggested outcome, should this Court conclude that his sentence is unconstitutional. Wyo. Stat. Ann. § 6–2–101 does not allow for a term-of-years sentence for felony murder, though Bear Cloud suggested that this Court should somehow impose one. Essentially, he asks this Court to serve as the Legislature on this matter and to "create" a term-of-years sentence. In the alternative, he suggests that his felony-murder conviction simply be stricken. Without specifically deciding now, this Court found authority to suggest that, in such a situation, the proper procedure would be to modify a first-degree murder conviction to that of second-degree murder, which carries with it the potential for a term-of-years sentence that could then be imposed upon Bear Cloud. *See Contreras v. Harrington,* 2011 WL 3740850, 5–8 (E.D.Cal.2011); *People v. Dillon, supra,* 34 Cal.3d 441, 488, 194 Cal.Rptr. 390, 668 P.2d 697 (Cal. 1983).

*Reiter v. State,* 2001 WY 116, ¶ 7, 36 P.3d 586, 589 (Wyo.2001) (quoting *V–1 Oil Co. v. State,* 934 P.2d 740, 742 (Wyo.1997)).

## B. *Wyoming Constitutional Analysis*

[¶ 47] Because Bear Cloud argues that, even if this Court concludes that his life sentence is constitutional under the Eighth Amendment, the Wyoming Constitution affords him greater protections and prohibits his life sentence for felony-murder, it is appropriate first to consider whether that may be the case.[6] This Court has summarized issues involving the Eighth Amendment to the United States Constitution thusly:

> The United States Supreme Court recently revisited its Eighth Amendment jurisprudence in *Graham v. Florida,* —— U.S. ——, 130 S.Ct. 2011, 2021, 176 L.Ed.2d 825, 835 (2010):
>
>> The Eighth Amendment states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." **To determine whether a punishment is cruel and unusual, courts must look beyond historical conceptions to " 'the evolving standards of decency that mark the progress of a maturing society.'"** *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, [290,] 50 L.Ed.2d 251 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, [598,] 2 L.Ed.2d 630 (1958) (plurality opinion)). "This is because '[t]he standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment. The standard itself remains the same, but its applicability must change as the basic mores of society change.'" *Kennedy v. Louisiana,* 554 U.S. 407, 419, 128 S.Ct. 2641, 2649, 171 L.Ed.2d 525, 538 (2008) (quoting *Furman v. Georgia,* 408 U.S. 238, 382, 92 S.Ct. 2726, [2800,] 33 L.Ed.2d 346 (1972) (Burger, C.J., dissenting)).
>
> The Cruel and Unusual Punishments Clause prohibits the imposition of inherently barbaric punishments under all circumstances. *See, e.g., Hope v. Pelzer,* 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). "[P]unishments of torture," for example, "are forbidden." *Wilkerson v. Utah,* 99 U.S. 130, 136, 25 L.Ed. 345 (1879). These cases underscore the essential principle that, under the Eighth Amendment, the State must respect the human attributes even of those who have committed serious crimes.
>
> For the most part, however, the Court's precedents consider punishments challenged not as inherently barbaric but as disproportionate to the crime. The concept of proportionality is central to the Eighth Amendment. Embodied in the Constitution's ban on cruel and unusual punishments is the "precept of justice that punishment for crime should be graduated and proportioned to [the] offense." *Weems v. United States,* 217 U.S. 349, 367, 30 S.Ct. 544, [549,] 54 L.Ed. 793 (1910).

*Tucker v. State,* 2010 WY 162, ¶¶ 49–50, 245 P.3d 301, 314–15 (Wyo.2010) (emphasis added).

In contrast,

> Article 1, § 14 of the Wyoming Constitution provides: "All persons shall be bailable by sufficient sureties, except for capital offenses when the proof is evident or the presumption great. Excessive bail shall not be required, nor excessive fines imposed, nor shall **cruel or unusual** punishment be inflicted." (Emphasis added.) The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor **cruel and unusual** punishments inflicted." (Emphasis added.) **Our state constitution articulates the standard in the disjunctive and the federal constitution in the conjunctive.** We have at least tacitly recognized that under our state constitution we will look at the two words individually. *Sampsell v. State,* 2001 WY 12, ¶¶ 10–11, 17 P.3d 724 ¶¶ 10–11 (Wyo.2001).

*Johnson v. State,* 2003 WY 9, ¶ 35, 61 P.3d 1234, 1248 (Wyo.2003) (emphasis added).

---

**6.** If this Court concludes that Bear Cloud's sentence is constitutional under Wyoming state-law standards, there is no need to enter into a separate, potentially broader federal-law analysis.

Because Wyoming's Constitution potentially provides Bear Cloud greater protection from cruel or unusual punishment, this Court first proceeds with an analysis of State constitutional law.

### i. *Categorical Challenge*

[¶ 48] Perhaps recognizing that both state and federal precedent have upheld the constitutionality of life sentences, as well as the constitutionality of life sentences for felony-murder, Bear Cloud does not present a facial challenge to his life sentence for felony-murder. *See, e.g., Johnson*, ¶ 36, 61 P.3d at 1248–49 ("The imposition of a life sentence for a homicide is a time honored and entirely humane method of punishing that crime."); *Mares v. State*, 939 P.2d 724, 727–28 (Wyo. 1997) (recognizing the constitutionality of the felony-murder rule). Instead, he narrows the issue, presenting a *categorical* challenge to a life sentence for juveniles convicted of felony murder. Some explanation as to the standard for analyzing such categorical challenges is useful. The United States Supreme Court fairly recently clarified:

> The [United States Supreme] Court's cases addressing the proportionality of sentences fall within two general classifications. The first involves challenges to the length of term-of-years sentences given all the circumstances in a particular case. The second comprises cases in which the Court implements the proportionality standard by certain categorical restrictions on the death penalty.
>
> In the first classification the Court considers all of the circumstances of the case to determine whether the sentence is unconstitutionally excessive. Under this approach, the Court has held unconstitutional a life without parole sentence for the defendant's seventh nonviolent felony, the crime of passing a worthless check. *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). In other cases, however, it has been difficult for the challenger to establish a lack of proportionality. A leading case is *Harmelin v. Michigan*, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), in which the offender was sentenced under state law to life without parole for possessing a large quantity of cocaine. A closely divided Court upheld the sentence. The controlling opinion concluded that the Eighth Amendment contains a "narrow proportionality principle," that "does not require strict proportionality between crime and sentence" but rather "forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Id.*, at 997, 1000–1001, 111 S.Ct. 2680 (KENNEDY, J., concurring in part and concurring in judgment). Again closely divided, the Court rejected a challenge to a sentence of 25 years to life for the theft of a few golf clubs under California's so-called three-strikes recidivist sentencing scheme. *Ewing v. California*, 538 U.S. 11, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003); see also *Lockyer v. Andrade*, 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). The Court has also upheld a sentence of life with the possibility of parole for a defendant's third nonviolent felony, the crime of obtaining money by false pretenses, *Rummel v. Estelle*, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980), and a sentence of 40 years for possession of marijuana with intent to distribute and distribution of marijuana, *Hutto v. Davis*, 454 U.S. 370, 102 S.Ct. 703, 70 L.Ed.2d 556 (1982) (*per curiam* ).
>
> The controlling opinion in *Harmelin* explained its approach for determining whether a sentence for a term of years is grossly disproportionate for a particular defendant's crime. A court must begin by comparing the gravity of the offense and the severity of the sentence. 501 U.S., at 1005, 111 S.Ct. 2680 (opinion of KENNEDY, J.). "[I]n the rare case in which [this] threshold comparison . . . leads to an inference of gross disproportionality" the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. *Ibid.* If this comparative analysis "validate[s] an initial judgment that [the] sentence is grossly disproportionate," the sentence is cruel and unusual. *Ibid.*
>
> The second classification of cases has used categorical rules to define Eighth Amend-

ment standards. The previous cases in this classification involved the death penalty. The classification in turn consists of two subsets, one considering the nature of the offense, the other considering the characteristics of the offender. With respect to the nature of the offense, the Court has concluded that capital punishment is impermissible for nonhomicide crimes against individuals. *Kennedy, supra*, at 438–39, 128 S.Ct., at 2660; see also *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); *Coker v. Georgia*, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977). In cases turning on the characteristics of the offender, the Court has adopted categorical rules prohibiting the death penalty for defendants who committed their crimes before the age of 18, *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), or whose intellectual functioning is in a low range, *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). See also *Thompson v. Oklahoma*, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988).

In the cases adopting categorical rules the Court has taken the following approach. The Court first considers "objective indicia of society's standards, as expressed in legislative enactments and state practice" to determine whether there is a national consensus against the sentencing practice at issue. *Roper, supra*, at 572, 125 S.Ct. 1183. Next, guided by "the standards elaborated by controlling precedents and by the Court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose," *Kennedy*, 554 U.S. at 420–21, 128 S.Ct., at 2650, the Court must determine in the exercise of its own independent judgment whether the punishment in question violates the Constitution. *Roper, supra*, at 572, 125 S.Ct. 1183.

The present case involves an issue the Court has not considered previously: a categorical challenge to a term-of-years sentence. The approach in cases such as *Harmelin* and *Ewing* is suited for considering a gross proportionality challenge to a particular defendant's sentence, but here a sentencing practice itself is in question.

This case implicates a particular type of sentence as it applies to an entire class of offenders who have committed a range of crimes. As a result, a threshold comparison between the severity of the penalty and the gravity of the crime does not advance the analysis. Here, in addressing the question presented, the appropriate analysis is the one used in cases that involved the categorical approach, specifically *Atkins, Roper*, and *Kennedy*.

*Graham v. Florida*, —— U.S. ——, 130 S.Ct. 2011, 2021–23, 176 L.Ed.2d 825 (2010). Thus, the real issue before this Court is not whether a sentence of life imprisonment is constitutional or even whether a life sentence for felony-murder is constitutional, but whether (1) persons under the age of eighteen should be exempt from it and/or (2) whether "accomplices" convicted of felony-murder who are juveniles should be exempt from it. *Compare Harmelin v. Michigan*, 501 U.S. 957, 976, 111 S.Ct. 2680, 2692, 115 L.Ed.2d 836 (1991). This Court considers each categorical challenge separately:

[¶ 49] First, and bearing in mind other cases that Bear Cloud cites, the Court notes that Bear Cloud specifically and primarily relies upon *Graham*, 130 S.Ct. 2011; *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005); and *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), to argue that, although he pleaded guilty to a felony-murder charge, the Eighth Amendment of the United States Constitution prohibits a life sentence because he was "solely an accessory with no showing that [he] committed the homicide, had knowledge, or intent to commit the homicide." Bear Cloud mentions two other cases, yet, neither *Atkins, supra* (holding that a state may not execute a mentally retarded individual) nor *Roper, supra* (holding that it is unconstitutional to execute an individual for a crime that he committed as a juvenile) are particularly helpful to Bear Cloud, as his case is distinguishable in that he is of "average intelligence" and not facing execution. Even in the most applicable case, *Graham*, 130 S.Ct. 2011, the United States Supreme Court determined that the Eighth Amendment of the United States Constitution pro-

hibits the imposition of a life *without parole* sentence on a *juvenile offender* in a *non-homicide* case. The United States Supreme Court specifically limited its holding to these circumstances. *See Graham*, 130 S.Ct. at 2015–17.[7]

[¶ 50] Other courts have refused to extend the *Graham* decision to cases involving either: (a) adults; (b) homicide; or (c) sentences involving the possibility of parole. *See, e.g., Smith v. State*, 258 P.3d 913, 920 (Alaska Ct.App.2011) (recognizing that it *is* constitutionally permissible to impose a life sentence on a juvenile); *Jackson v. Norris*, 2011 Ark. 49, 5, —— S.W.3d —— (Ark.2011) (declining to extend *Graham* to homicide cases involving a juvenile where the death penalty is not at issue.); *Bell v. Haws*, No. CV09–3346–JFW, 2010 WL 3447218, at 11 (C.D.Cal. July 14, 2010) (not reported) (refusing to apply *Graham* where the defendant was eligible for parole); *Jensen v. Zavaras*, No. 08–CV–01670–RPM, 2010 WL 2825666, at 1 (D.Colo. July 16, 2010) (unpublished) (involving conviction for a homicide where the defendant's "actions ultimately [caused] death"). In fact, other courts have commented on the *lack* of judicial precedent holding that a "mandatory life sentence without the possibility for parole for a juvenile homicide offender violates the Eighth Amendment's prohibition against cruel and

unusual punishment." *State v. Andrews*, 329 S.W.3d 369, 376–77 n. 6 (Mo.2010).

[¶ 51] Here, while Bear Cloud was a juvenile at the time of the commission of the offenses involved, this case involves homicide (vis-à-vis felony-murder as applied to Bear Cloud) for which a sentence of life with the possibility of parole was imposed. Two of the distinguishing characteristics of *Graham* are absent from the present case: This matter involved a homicide and Bear Cloud's sentence includes the possibility of parole. As a result, this Court can, and does, refuse to apply *Graham* so as to hold that a sentence of life with the possibility of parole imposed upon a juvenile offender for a homicide case is a violation of the Eight Amendment of the United States Constitution.

[¶ 52] Recognizing the inherent limitations of *Graham* and Wyoming precedent, Bear Cloud asks this Court to *extend Graham* to the following situations: (a) homicide situations where the juvenile was not the individual who "pulled the trigger" (i.e. an accomplice to the homicide) and (b) life sentences for juveniles. Bear Cloud's argument, in effect, is that life imprisonment in Wyoming is a grossly disproportionate punishment when assessed against an accomplice to murder and/or against a juvenile offender.

---

7. On November 7, 2011, the United States Supreme Court granted *certiorari* to two cases involving the constitutionality of the sentence of life *without* parole for a juvenile convicted of homicide. In *Miller v. Alabama*, —— U.S. ——, 132 S.Ct. 548, 181 L.Ed.2d 395, 2011 WL 5322568 (2011), the United States Supreme Court will examine the following issues:

1. Does imposition of a life-without-parole sentence on a fourteen-year-old child convicted on homicide violate the Eighth and Fourteenth Amendments' prohibition against cruel and unusual punishment when the extreme rarity of such sentences in practice reflects a national consensus regarding the reduced criminal culpability of young children?

2. Does imposition of a mandatory sentence of life imprisonment without parole on a fourteen-year-old child convicted of homicide—a sentence imposed pursuant to a statutory scheme that categorically precludes consideration of the offender's young age or any other mitigating circumstances—violate the Eighth and Fourteenth Amendments' prohibition on cruel and unusual punishment?

In the "tandem" case, *Jackson v. Hobbs*, —— U.S. ——, 132 S.Ct. 548, 181 L.Ed.2d 395, 2011 WL 5322575 (2011), the United States Supreme Court will consider:

1. Does imposition of a life-without-parole sentence on a fourteen-year-old child convicted of homicide violate the Eighth and Fourteenth Amendments' prohibition against cruel and unusual punishments, when the extreme rarity of such sentences in practice reflects a national consensus regarding the reduced criminal culpability of young children?

2. Does such a sentence violate the Eighth and Fourteenth Amendments when it is imposed upon a fourteen-year-old who did not personally kill the homicide victim, and was not shown even to have anticipated, let alone intended, that anyone be killed?

3. Does such a sentence violate the Eighth and Fourteenth Amendments when it is imposed upon a fourteen-year-old as a result of a mandatory sentencing scheme that categorically precludes consideration of the offender's young age or any other mitigating circumstances?

### a. Extension of Graham to Felony–Murder

[¶ 53] Bear Cloud's felony-murder conviction and life sentence was imposed pursuant to Wyo. Stat. Ann. § 6–2–101, which provides:

> (a) **Whoever** purposely and with premeditated malice, or **in the perpetration of, or attempt to perpetrate,** any sexual assault, sexual abuse of a minor, arson, **robbery, burglary,** escape, resisting arrest, kidnapping or abuse of a child under the age of sixteen (16) years, **kills any human being is guilty of murder in the first degree.**
>
> (b) **A person convicted of murder in the first degree shall be punished by death, life imprisonment without parole or life imprisonment according to law, except that no person shall be subject to the penalty of death for any murder committed before the defendant attained the age of eighteen (18) years.**

*Id.* (emphasis added).

[¶ 54] In the parlance of the United States Supreme Court, Bear Cloud's argument is "a categorical challenge" to a life sentence for felony-murder. *See Graham,* 130 S.Ct. at 2022. And, where a sentencing practice itself is in question, and where the case implicates a particular type of sentence as it applies to an *entire class* of offenders who have committed a range of crimes, a threshold comparison between the severity of the penalty and the gravity of the crime does not advance the analysis. *Id.* at 2023. When faced with such a categorical challenge, the judiciary, in determining whether the punishment at issue is grossly disproportionate to the offense, must consider: (1) whether there is a national consensus against imposing the punishment for the offense; (2) the moral culpability of the offenders at issue in light of their crimes and characteristics; (3) the severity of the punishment; and (4) whether the punishment serves legitimate penological goals. *See id.* at 2022, 2026. Accordingly, this Court considers all of the circumstances of the case to determine whether the sentence is unconstitutionally excessive:

[¶ 55] *National Consensus*: The best evidence of a national consensus with respect to the appropriateness of a particular punishment for a particular offense is the legislation enacted by the nation's legislatures. *See Atkins,* 536 U.S. at 312, 122 S.Ct. at 2247. "Actual sentencing practices are [also] an important part of [a court's] inquiry into consensus." *Graham,* 130 S.Ct. at 2023.

[¶ 56] Regarding Bear Cloud's request to extend *Graham* to felony-murder situations where the defendant is not the individual who "pulled the trigger," but merely an accomplice, this Court notes that Wyoming has long-recognized the Felony–Murder Rule thusly: "If two or more persons are jointly engaged in the perpetration of or an attempt to perpetrate a robbery, and a human being is killed during its commission by any one of the persons so jointly engaged, then each of the offenders are equally guilty of the homicide." *Jones,* 568 P.2d at 846. *See also Richmond v. State,* 554 P.2d 1217 (Wyo.1976), *reh'g denied* 558 P.2d 509 (Wyo.1977). The required elements of first degree murder—premeditation, deliberation and malice aforethought—are imputed by a conclusive statutory presumption when one commits felony murder in the course of a robbery. *Id.*

[¶ 57] Wyoming is by no means alone in this approach. *See, e.g., Simpson v. Lockhart,* 942 F.2d 493 (8th Cir.1991) (upholding Arkansas felony murder statute); *State v. Frazier,* 646 N.W.2d 744, 750–53 (S.D.2002) ("Courts have generally upheld the constitutionality of felony murder statutes."); *State v. Murphy,* 91 Ohio St.3d 516, 747 N.E.2d 765 (2001) (upholding death penalty in robbery-murder case even though defendant did not intend to kill anyone); *People v. Musselwhite,* 17 Cal.4th 1216, 74 Cal. Rptr.2d 212, 954 P.2d 475 (1998) (holding no Eighth Amendment requirement that felony murder statute applies only to premeditated and deliberate murders); *People v. Cisneros,* 855 P.2d 822 (Colo.1993) (upholding automatic sentence of life imprisonment for felony murder); *State v. Dixon,* 237 Neb. 630, 467 N.W.2d 397 (1991) (denying claim that felony murder statute allows cruel and unusual punishment without requisite intent to kill); *State v. Gilmer,* 96 Wash.App. 875, 981 P.2d 902 (1999) (holding felony murder statute

may be harsh but not unconstitutional). There is, among the majority of jurisdictions, an "apparent consensus that substantial participation in a violent felony under circumstances likely to result in the loss of innocent human life may justify the death penalty even absent an intent to kill." *Tison v. Arizona,* 481 U.S. 137, 154–55, 107 S.Ct. 1676, 1686, 95 L.Ed.2d 127 (1987) (citations omitted). Specific intent is not required in order to satisfy Eighth Amendment analysis because "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." *Tison,* 481 U.S. at 158, 107 S.Ct. at 1688 (citing *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982)). Indeed, numerous cases have rejected cruel and/or unusual punishment challenges to life sentences imposed on minors for felony-murder. *See, e.g., People v. Archuleta,* No. D057609, 2011 WL 4912576, at 11 (Cal.App. 4 Dist. Oct.17, 2011) (not reported); *State v. Wonnum,* No. 0505004361, 2006 WL 2808148, at *1 (Del.Super.Ct., Sept. 22, 2006) (not reported) (mandatory life sentence given to 17 year-old for felony murder did not violate state or federal prohibition against cruel and unusual punishment), *rev'd on other grounds,* 942 A.2d 569 (Del.2007). In short, Bear Cloud has not established a national consensus against the appropriateness of a life sentence of felony-murder, for juveniles or adults.

 *Moral Culpability* : Bear Cloud asserts that, because an individual convicted of felony-murder did not have the intent to commit the murder (or, more specifically, that he did not *directly* cause or intend to cause Mr. Ernst's death), the sentence should be lesser to account for lesser culpability. He contends that he did not "intend" for any homicide to occur and, thus, an extension of *Graham* is appropriate under *Graham*'s recognition:

> The Court has recognized that defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers. *Kennedy, supra; Enmund,* 458 U.S. 782, 102 S.Ct. 3368; *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987); *Coker,* 433 U.S. 584, 97 S.Ct. 2861. There is a line "between homicide and other serious violent offenses against the individual." *Kennedy,* 554 U.S. at 438, 128 S.Ct., at 2659–60. Serious nonhomicide crimes "may be devastating in their harm ... but 'in terms of moral depravity and of the injury to the person and to the public,' ... they cannot be compared to murder in their 'severity and irrevocability.' " *Id.,* at 438, 128 S.Ct., at 2660 (quoting *Coker,* 433 U.S., at 598, 97 S.Ct. 2861 (plurality opinion)). This is because "[l]ife is over for the victim of the murderer," but for the victim of even a very serious nonhomicide crime, "life ... is not over and normally is not beyond repair." *Ibid.* (plurality opinion). Although an offense like robbery or rape is "a serious crime deserving serious punishment," *Enmund, supra,* at 797, 102 S.Ct. 3368, those crimes differ from homicide crimes in a moral sense.

*Graham,* 130 S.Ct. at 2027 (emphasis added).

[¶ 59] However, the rationale behind the Felony–Murder Rule belies Bear Cloud's lesser-culpability argument:

> Wyoming is among those states which limit the imposition of the felony murder rule by listing specific underlying felonies. The list includes those offenses traditionally regarded as "crimes of violence." Black's Law Dictionary, 371 (6th ed. 1990). The legislature's selection of sexual assault, arson, robbery, burglary, escape, resisting arrest or kidnapping discloses a purpose of providing a more significant punishment for the *negligent or accidental* killing which may occur during the commission of one of these crimes. **The enumerated felonies are those which the legislature found to involve "a significant prospect of violence."** LaFave & Scott, *supra,* § 7.5(b) (citing W.S. 6–2–101 (1977)).

*Cook v. State,* 841 P.2d 1345, 1351 (Wyo.1992) (emphasis added).

 The lesson to be taken from Wyoming's adoption of the Felony–Murder Rule is that, where a crime involves a "significant prospect of violence," it is reasonable to impute the knowledge and foreseeability of a victim's death. As a result, a co-defendant

who is engaged in the commission of the underlying offense is chargeable with the murder and *equally as culpable* as the individual brandishing the murder weapon. *See Mares*, 939 P.2d 724; *Harris v. State*, 933 P.2d 1114 (Wyo.1997); *Cloman v. State*, 574 P.2d 410 (Wyo.1978); *Jones v. State*, 568 P.2d 837 (Wyo.1977).

[¶ 60] While a "mere" accomplice may not have had the specific intent to kill the victim, where he was a major participant in a violent felony under circumstances likely to result in the loss of innocent human life, he is equally culpable. To argue that the resulting murder is not foreseeable or that the accomplice did not act with reckless indifference to human life is specious, particularly where, as here, the accomplice's involvement in the crime is substantial. *See Tison*, 481 U.S. at 154, 107 S.Ct. at 1686. *See also Harmelin*, 501 U.S. at 1004, 111 S.Ct. at 2706 (Kennedy, J., concurring) (quoting *Solem v. Helm*, 463 U.S. 277, 290, n. 15, 103 S.Ct. 3001, 3009, n. 15, 77 L.Ed.2d 637 (1983)) (additional citation omitted) ("the crime of felony murder without specific intent to kill ... [is] a crime for which 'no sentence of imprisonment would be disproportionate.' "). This concept holds particularly true where the actors planned the crime in advance and armed themselves in order to have the ability to inflict death or serious injury during the course of the crime. Such was the case here.

[¶ 61] *The Punishment*: Life imprisonment *with* the possibility of parole is the *least severe* penalty permitted by Wyoming law for a felony-murder conviction. *See* Wyo. Stat. Ann. § 6–2–101(b). While this Court recognizes the inherent severity of this punishment, in the context of first-degree murder and felony-murder, virtually every court that has considered the issue has recognized the appropriateness of this sentence, even where the offender did not intend the homicide.[8] *See, e.g., Jensen*, No. 08–CV–01670–RPM, 2010 WL 2825666 (not reported)

(where life imprisonment was upheld where the juvenile contended he was simply a complicitor who did not actually kill the victim); *People v. Hernandez*, No. B223310, 2011 WL 539448 (Cal.Ct.App. Feb.17, 2011) (not reported) (where life imprisonment was upheld where juvenile did not perform the act that ultimately resulted in the victim's death); *Bell v. State*, No. CR 10–1262, 2011 WL 4396975 (Ark. Sept. 22, 2011) (not reported) ("there is no distinction between principals on the one hand and accomplices on the other").

[¶ 62] Bear Cloud has not presented this Court with any authority that rejects the imposition of a life sentence in felony-murder cases, even where there is an argument as to lesser culpability. In fact, this Court has specifically declined to adopt a rule, without legislative action, that would allow a defendant to escape liability for murder even if he could prove that: (1) he did not commit the homicidal act; (2) he had no reason to believe that another participant would commit the homicide; (3) he was not armed; and (4) he had no reason to believe another participant was armed. *See Mares*, 939 P.2d at 727–28. Without commenting upon whether Bear Cloud could have satisfied the *Mares* test, this Court concludes that the punishment of a life sentence is severe, but warranted, for felony-murder, even where the offender did not commit the act that directly caused the homicide.

[¶ 63] *Penalogical Goals*: Finally, this Court considers the four goals of penal sanctions that have been recognized as legitimate: retribution, deterrence, incapacitation, and rehabilitation. *See Graham*, 130 S.Ct. at 2028.

Criminal punishment can have different goals, and choosing among them is within a legislature's discretion. See *Harmelin, supra*, at 999, 111 S.Ct. 2680 (opinion of Kennedy, J.) ("[T]he Eighth Amendment

---

8. Notably, in *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), the United States Supreme Court held that it was not cruel and unusual punishment to impose the *death penalty* upon a defendant who played a significant role in the felony that resulted in murder and who acted with reckless indifference to human life. Where a defendant "contemplated" that lethal force would be used, it is permissible to impose the death penalty. *See also White v. Wainwright*, 809 F.2d 1478, 1484 (11th Cir. 1987). Yet, Bear Cloud was not subjected to the death penalty, nor does his argument extend so far as to encompass such a sentence.

does not mandate adoption of any one penological theory"). It does not follow, however, that the purposes and effects of penal sanctions are irrelevant to the determination of Eighth Amendment restrictions. A sentence lacking any legitimate penological justification is by its nature disproportionate to the offense.

*Id.* at 2028–30.

[¶ 64] Before engaging in a consideration of the appropriateness of the penalogical goals for life sentences for felony-murder, this Court recalls that, first, the fixing of prison terms for specific crimes involves a substantive penalogical judgment that, as a general matter, is properly within the province of legislatures, not the courts. *See Harmelin,* 501 U.S. at 998, 111 S.Ct. at 2703. Second, "the Eighth Amendment does not mandate adoption of any one penological theory." *Id.* at 999, 111 S.Ct. at 2704. Rather, "[t]he federal and state criminal systems have accorded different weights at different times to the penological goals of retribution, deterrence, incapacitation, and rehabilitation." *Id.* "Third, marked divergences among the different states both in underlying theories of sentencing and in the length of prescribed prison terms are an inevitable, often beneficial, result." *Id.* Thus, the circumstance that a State has the most severe punishment for a particular crime does not, by itself, render the punishment grossly disproportionate, even if that State treats the crime more severely than any other state. *See Harmelin,* 501 U.S. at 1000, 111 S.Ct. at 2704. Fourth, reviewing courts "should be informed by objective factors to the maximum possible extent." *Id. See also State v. Higgins,* 265 Conn. 35, 826 A.2d 1126, 1145–47 (2003). With that guidance in mind, this Court considers the penalogical goals at issue here.

[¶ 65] The goal of retribution reflects society's and the victim's interests in seeing that the offender is repaid for the hurt he caused. *See Kennedy v. Louisiana,* 554 U.S. 407, 442, 128 S.Ct. 2641, 2662, 171 L.Ed.2d 525 (2008). Retribution has long been recognized as a "legitimate reason to punish." *Graham,* 130 S.Ct. at 2028. "The heart of the retribution rationale is that a

criminal sentence must be directly related to the personal culpability of the criminal offender." *Tison,* 481 U.S. at 149, 107 S.Ct. at 1683. Participants in violent felonies, such as armed burglaries, frequently can anticipate that lethal force might be used in accomplishing the underlying felony. "Indeed, the possibility of bloodshed is inherent in the commission of any violent felony and this possibility is generally foreseeable and foreseen; it is one principal reason that felons arm themselves." *Tison,* 481 U.S. at 150–51, 107 S.Ct. at 1684. While the case is somewhat weaker for a criminal defendant who served as an "accomplice" to murder during the commission of a violent felony, life imprisonment, *with* the possibility of parole, is a recognizably lesser sentence than the alternatives of life without parole or death. Where a life was taken, and the offender played a role in that taking, society may express its moral outrage and attempt to right the balance for the wrong to the victim. Retribution certainly justifies imposition of the *least* severe penalty on the less-culpable felony-murder accomplice. Other courts have considered the appropriateness of the imposition even of the death penalty for felony-murder upon an accomplice in light of penalogical goals. *See State v. Gamble,* 63 So.3d 707, 725–26 (Ala.Crim.App.2010). Because this case does not involve death penalty considerations, there is less emphasis upon the individual defendant's culpability as opposed to the culpability of those who committed the murder. *See Tison,* 481 U.S. at 149, 107 S.Ct. at 1683. The sentence of life imprisonment, with the possibility of parole, is not excessive in light of retributive penalogical goals.

[¶ 66] Recognizing that the death penalty will not likely deter "if a person does not intend that life be taken or contemplate that lethal force will be employed by others," *Enmund v. Florida,* 458 U.S. 782, 799, 102 S.Ct. 3368, 3377, 73 L.Ed.2d 1140 (1982), the same cannot be said of a sentence of life with the possibility of parole under felony-murder circumstances, particularly under Wyo. Stat. Ann. § 6–2–101(a), which limits the application of felony-murder to certain crimes. Legislatures have

"broad discretion to fashion a sentence that fits within the scope of the proportionality principle." *See Andrade*, 538 U.S. at 76, 123 S.Ct. at 1175. An appropriate consideration with respect to determining whether a particular penalty may be considered cruel and unusual is whether, in light of the nature and seriousness of the offense, a state legislature had a rational basis for imposing a greater punishment. *See Harmelin*, 501 U.S. at 1003–05, 111 S.Ct. at 2706–07. For example, in *Harmelin*, the Supreme Court stated that, with respect to the penalty in the case before it, the state legislature "could with reason conclude that the threat posed to the individual and society by possession of [a] large ... amount of cocaine-in terms of violence, crime, and social displacement-is momentous enough to warrant the deterrence and retribution of a life sentence without parole," and concluded that Michigan's mandatory penalty of a term of life *without* parole for possession of more than 650 grams of cocaine was not so disproportionate as to violate the Eighth Amendment. *Id.* at 1003, 1005, 111 S.Ct. at 2706, 2707 (citations omitted). But for his age, Bear Cloud could arguably have faced a sentence of death. The punishment of life imprisonment *with* the possibility of parole is a severe sanction and, thus, will serve as an adequate deterrent. But it is not so severe or disproportionate in the case of felony-murder as to cause this Court to conclude that the Wyoming Legislature did not have a rational basis for its imposition. This Court concludes that the potential for life imprisonment has a sufficient deterrent effect to meet this legitimate penological goal.

[¶ 67] Incapacitation, a third legitimate reason for imprisonment, also justifies a sentence of life with the possibility of parole for felony-murder. Recidivism is a serious risk to public safety, and so incapacitation is an important goal. *See Ewing v. California*, 538 U.S. 11, 26, 123 S.Ct. 1179, 1188, 155 L.Ed.2d 108 (2003) (plurality opinion). Accordingly, incapacitation is a legitimate penological goal sufficient to justify life imprisonment with the possibility of parole, even where a murder was committed by a co-defendant, particularly in the limited situations where the Felony–Murder Rule is applied in Wyoming. Under the facts before it,

this Court is not called upon to consider the justification of life imprisonment *without* parole on the assumption that an offender forever will be a danger to society because parole *is* a possibility in this instance. Co-defendants, even those serving as mere "accomplices" to these violent crimes pose an immediate risk to society. While they deserve "to be separated from society for some time," by allowing the possibility of parole, the Wyoming Legislature is not requiring that separation to be for the rest of an offender's life. *Compare Graham*, 130 S.Ct. at 2028–30.

[¶ 68] The final penological consideration is rehabilitation.

> Finally there is rehabilitation, a penological goal that forms the basis of parole systems. See *Solem*, 463 U.S., at 300, 103 S.Ct. 3001; *Mistretta v. United States*, 488 U.S. 361, 363, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). The concept of rehabilitation is imprecise; and its utility and proper implementation are the subject of a substantial, dynamic field of inquiry and dialogue. See, *e.g.*, Cullen & Gendreau, Assessing Correctional Rehabilitation: Policy, Practice, and Prospects, 3 Criminal Justice 2000, pp. 119–133 (2000) (describing scholarly debates regarding the effectiveness of rehabilitation over the last several decades). It is for legislatures to determine what rehabilitative techniques are appropriate and effective.

*Graham*, 130 S.Ct. at 2028–30. Because courts have held that, in the felony-murder context, both life imprisonment without the possibility of parole and the death penalty may be appropriate, largely on deterrent and retribution grounds, this Court is not inclined to devote significant time to the issue that rehabilitation is not served by a sentence of life imprisonment with the possibility of parole in the felony-murder context. Suffice it to say that, as is discussed later herein, rehabilitation is a factor that enters into the equation. To conclude, a sentence as serious as life imprisonment with the possibility of parole supports the penological interests in protecting society from the defendant; serves as a deterrent to others who engage, or plan to engage in, serious crimes; ad-

dresses society's need for retribution for a felony-murder offender's participation in the murder; and still provides the offender with an opportunity for rehabilitation. *See generally Brown v. Horel*, 2011 WL 900547, at 13 (N.D.Cal.2011) (not reported). Penalogical theory adequately justifies a life sentence, with the possibility of parole, for felony-murder convictions, even where the offender did not directly commit the murder.

### b. Extension of Graham: Life Imprisonment for Juveniles

▉▉ [¶ 69] Having upheld the state and federal constitutionality of a life sentence under the Felony–Murder Rule, even where the offender did not directly commit the murder, we next consider the identical factors as applied to *juvenile* offenders facing a life sentence. Relying upon the "significant psychological differences" between juveniles and adults, Bear Cloud mounts an alternative argument that a life sentence for a juvenile is *different* than a life sentence for an adult and, thus, constitutes cruel or unusual punishment. *See generally Workman v. Com.*, 429 S.W.2d 374, 377 (Ky.1968). Again, the analysis requires this Court to consider: (1) whether there is a national consensus against imposing the punishment for the offense; (2) the moral culpability of the offenders at issue in light of their crimes and characteristics; (3) the severity of the punishment; and (4) whether the punishment serves legitimate penalogical goals. *Graham*, 130 S.Ct. at 2022, 2026.

[¶ 70] *National Consensus* : Without belaboring the point, and in light of this Court's earlier analysis in the context of felony-murder, Bear Cloud simply has not established that there is presently a national consensus against imposing life imprisonment *without* the possibility of parole on a juvenile convicted of a homicide offense, much less life imprisonment *with* the possibility of parole. Although *Graham* underscores the concept that youth are more impetuous; are more vulnerable or susceptible to negative and outside pressures, and the personality traits of a juvenile are less fixed and more transitory, case law does not mandate that lengthy sentences are *per se* excessive in all cases involving juveniles. *See People v. Demirdjian*, 144 Cal.App.4th 10, 15, 50 Cal.Rptr.3d 184, 187 (Cal.App. 2 Dist.2006); *Andrews*, 329 S.W.3d at 376–78 ("*Roper* expressly and *Graham* implicitly recognize that life without parole is not cruel and unusual punishment for a minor who is convicted of a homicide."); Sally Terry Green, *Realistic Opportunity for Release Equals Rehabilitation: How the States Must Provide Meaningful Opportunity for Release*, 16 Berkeley J. of Crim. Law 1, 3 (Spring 2011) ("*Graham* does not generally preclude sentencing juveniles to life in prison"). There is "nothing inherently unconstitutional about imposing sentences of life *without* parole on juvenile offenders." *Graham*, 130 S.Ct. at 2041 (Roberts, C.J., concurring) (emphasis added). *See also People v. Bentley*, No. 214170, 2000 WL 33519653, at 1–3 (Mich.App. April 11, 2000) (not reported); *Com. v. Carter*, 855 A.2d 885, 892 (Pa.Super.2004); *State v. Pittman*, Nos. 04–GS–12–571, 04–GS–12–572, 2005 WL 831970, at 4 (S.C.Gen.Sess. April 11, 2005) (not reported); *Bell v. State*, No. CR 10–1262, 2011 WL 4396975 (not reported); *Jones v. State*, ── So.3d. ──, No.2009–CA–02033–COA, 2011 WL 3671890 (Miss.App. Aug.23, 2011); *Paolilla v. State*, 342 S.W.3d 783 (Tex.Ct.App. 2011); *Hernandez*, No. B223310, 2011 WL 539448 (not reported); *People v. Adderley*, No. B217620, 2011 WL 817751 (Cal.Ct.App. March 10, 2011) (not reported); *Jackson*, 2011 Ark. 49, 5, ── S.W.3d at ──; *Andrews*, 329 S.W.3d 369; *Miller v. State*, 63 So.3d 676 (Ala.Crim.App.2010); *Jensen*, No. 08–CV–01670–RPM, 2010 WL 2825666 (not reported); *Bell v. Haws*, No. CV09–3346–JFW, 2010 WL 3447218 (not reported). It would defy logic, then, for this Court to conclude that the imposition of life *with* the possibility of parole for juveniles is inherently unconstitutional.

▉▉▉ [¶ 71] Bear Cloud argues that this Court should be guided by "evolving standards" invoked in the application of the cruel or unusual analysis. However, defining crime and determining punishment are matters uniquely legislative in nature. *See People v. Lewis*, 21 Cal.App.4th 243, 251, 25 Cal.Rptr.2d 827 (1993). A defendant must overcome a considerable burden in challeng-

ing a penalty as cruel or unusual, and this Court will not lightly encroach on matters that are more properly in the domain of the Wyoming Legislature. "The validity of such enactments will not be questioned unless their unconstitutionality clearly, positively, and unmistakably appears." *See People v. Sullivan*, 151 Cal.App.4th 524, 569, 59 Cal. Rptr.3d 876 (2007) (internal citations omitted); *Contreras v. Harrington*, 2011 WL 3740850, at 5–8 (E.D.Cal. Aug.24, 2011). Quite simply, "there is no constitutional guarantee of special treatment for juvenile offenders." *Carter*, 855 A.2d at 892. Thus, if a juvenile's substantive due process rights are not violated for being tried for murder in adult/criminal court, it follows that it cannot be cruel and unusual punishment to sentence the juvenile as an adult would be sentenced. "It would be preposterous for the Legislature to mandate that a juvenile who commits murder be prosecuted in the criminal system but also be protected from its sanctions." *Id.* at 892. Ultimately, this Court cannot conclude that a "national consensus" warrants a declaration that imposition of life with the possibility of parole as a sentence for juvenile offenders is unconstitutional.

[¶ 72] *Moral Culpability*: Relying heavily upon *Graham*, Bear Cloud argues that a juvenile offender's moral culpability is diminished as compared to that of an adult offender. This argument is similar to that which he made regarding the lesser culpability of an accomplice to murder who is convicted of felony-murder. In *Graham*, the United States Supreme Court stated:

"*Roper* [*v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005),] established that because juveniles have lessened culpability they are less deserving of the most severe punishments. As compared to adults, juveniles have a lack of maturity and an underdeveloped sense of responsibility; they are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure; and their characters are not as well formed. These salient characteristics mean that it is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile of-

fender whose crime reflects irreparable corruption. Accordingly, juvenile offenders cannot with reliability be classified among the worst offenders. A juvenile is not absolved of responsibility for his actions, but his transgression is not as morally reprehensible as that of an adult."

*Graham*, 130 S.Ct. at 2026 (citations and internal quotation marks omitted). On the other hand, juvenile defendants who kill are categorically more deserving of even the most serious forms of punishment than are defendants who do not kill, intend to kill, or foresee that life will be taken. Still, this Court is not asked to consider the *most serious* punishment to which Bear Cloud might have been subjected, but only to consider the constitutionality of life imprisonment with the possibility of parole. A juvenile homicide offender's moral culpability is still great even if it is diminished as compared to that of an adult offender, and this Court cannot conclude that the diminished moral culpability of a juvenile offender necessarily negates the potential for life imprisonment.

[¶ 73] *The Punishment*: Again, life imprisonment according to law, at issue here, unquestionably is a serious punishment. But, it is not the most severe penalty to which Bear Cloud might have been subjected for his commission of felony-murder, *see* Wyo. Stat. Ann. § 6–2–101(a), and, for the reasons stated above, this Court does not believe the punishment is so severe as to render it unconstitutional.

[¶ 74] *Penalogical Goals*: Again considering the named penalogical goals of retribution, deterrence, incapacitation, and rehabilitation, this Court notes that society is entitled to impose severe sanctions on a juvenile offender to express its condemnation of their crimes and to seek restoration of the moral imbalance caused by the offense. Even with a juvenile homicide offender, the case for retribution remains strong, perhaps not lessened at all by the youth of the offender in light of the nature of the crime. In considering the goal of deterrence, the United States Supreme Court commented that "[d]eterrence, on the other hand, is not

served by imposing life without parole, as opposed to imposing life with parole, on a juvenile capital offender." *Meadoux v. State*, 325 S.W.3d 189, 195 (Tex.Crim.App. 2010). Here, while recognizing that juveniles are less susceptible to deterrence given their lack of maturity and undeveloped sense of responsibility, *see Graham*, 130 S.Ct. at 2022, 2026, this Court also notes that the United States Supreme Court made a specific distinction between the imposition of life *without* the possibility of parole and life *with* said possibility. *Id.* "To the extent that any punishment has a deterrent effect on a teenager, the punishment of life with parole is itself a severe sanction, especially for a youth." *Meadoux*, 325 S.W.3d at 196. Regarding the penalogical goal of incapacitation, public safety can be ensured with life sentences and the parole system. The Wyoming Legislature has agreed, reasonably concluding that the separation of juveniles for a period of time is appropriate but that their ability to return to society should be considered. Finally, considering the goal of rehabilitation, *Graham* recognized only that a sentence of life imprisonment *without* parole cannot be justified in the context of *non-homicide* cases. *Id.* at 2029–30. "By denying the defendant the right to reenter the community, the State makes an irrevocable judgment about that person's value and place in society." *Id.* at 2030. Yet, Bear Cloud asks this Court to broaden that notion to Wyoming's sentence of life *with* the possibility of parole given that *Graham* specifically imposed upon the States only the obligation to afford juvenile offenders "some meaningful opportunity to obtain release." *Id.*

[¶ 75] Ignoring, for the moment and for the sake of argument, the distinction between homicide and non-homicide convictions, the *Graham* Court specifically opined:

A State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime. What the State must do, however, is give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. It is for the State, in the first instance, to explore the means and mechanisms for compliance. It bears emphasis, however, that while the Eighth Amendment forbids a State from imposing a life without parole sentence on a juvenile nonhomicide offender, it does not require the State to release that offender during his natural life. Those who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives. The Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life. It does forbid States from making the judgment at the outset that those offenders never will be fit to reenter society.

*Id.* at 2030.

Comparing Wyoming's sentencing system with the practice of executive clemency, frowned upon in *Graham, see id.* at 2027, Bear Cloud asserts that Wyoming's sentencing scheme for life *with* the possibility of parole is comparable to life *without* parole.

The structure of Wyoming law creates a total life sentence which is unaffected by parole or good time reductions. Consequently, only the Governor's constitutional authority under Wyo. Const. art. 4, § 5, as recognized by W.S. 7–13–801 through 7–13–806, can serve to release the incarcerated individual before he dies in prison. Therefore, under present and long existent Wyoming law, the only remission except death that can be provided from the life sentence is by action through the executive power of commutation.

*Weldon v. State*, 800 P.2d 513, 514 (Wyo. 1990).

More specifically, Wyo. Stat. Ann. §§ 6–2–101 and 6–10–301(c),[9] providing for life imprisonment with the possibility of pa-

---

9. That provision states, in part:
 A sentence of life or life imprisonment which is not specifically designated as a sentence of life imprisonment without parole is subject to commutation by the governor. A person sentenced to life or life imprisonment is not eligible for parole unless the governor has commuted the person's sentence to a term of years. Wyo. Stat. Ann. § 6–10–301(c).

role, permit the consideration of parole *only* upon a commutation by the Governor of Wyoming of the life sentence into a term-of-years sentence. *Id. See also Booth v. State*, 2008 WY 3, 174 P.3d 171 (Wyo.2008). Bear Cloud argues that, because commutation is "rare," it does not provide a "meaningful opportunity for release." The *Graham* Court took particular offense to the notion that juveniles serving life without parole are often denied access to vocational training and other rehabilitative services that are available to other inmates, thereby negating the potential for rehabilitation and making disproportionality of the sentence all the more evident. *See Graham*, 130 S.Ct. at 2028–30. However, the Court left it to the States to devise methods of allowing juvenile offenders an opportunity for release based on maturity and rehabilitation. *Id. See, e.g., Angel v. Com.*, 281 Va. 248, 704 S.E.2d 386, 402 (2011).

[¶ 76] A more in-depth review of Wyoming's commutation system reassures this Court that Wyoming has met the challenge provided by *Graham*. More specifically, a Wyoming juvenile offender sentenced to life imprisonment is eligible for parole upon a commutation of his sentence by the Governor. *See* Wyo. Stat. Ann. §§ 6–2–101 and 6–10–301(c). The Governor considers commutation requests only upon the recommendation of the Wyoming Board of Parole. *See Wyoming Board of Parole, Policy and Procedure Manual*, at 31–32 (effective July 1, 2011). In determining whether to recommend commutation to the Governor, the Board of Parole employs a specific procedure that considers, among other factors, an offender's personal history, institutional history, and parole plan. *Id.* at 32. The Board is charged with the mission of considering "public safety, victims and the treatment and control of the offender" in all its decisions. *Id.* at 2. In sum, commutation decisions are made after having afforded *all* offenders, including juveniles, an opportunity to demonstrate maturity and rehabilitation.[10] The Board of Parole has delineated specific factors to consider for commutation recommendations:

> The primary considerations of the Board are public safety, victim concerns, and treatment and control of the offender. The ultimate goal is successful reentry of appropriate offenders into society while minimizing the risk of re-offending through appropriate treatment and supervision.

> Parole is granted only with the best interests of society being considered and not as an award of clemency.

> The Board considers whether there is a reasonable probability that the inmate is able and willing to fulfill obligations as a law abiding citizen.

> The Board takes into account that sentences are usually imposed for the purposes of punishment, rehabilitation, general deterrence and removal from society.

> Factors reviewed to make these determinations include social background and history, criminal record, facts of the current offense and its continuing impact on victims, institutional behavior and rehabilitative efforts, medical and mental health issues and treatment needs, and suitability of proposed parole plans to assure successful reentry.

> Input from certified victims is always sought and considered prior to parole hearings.

> Input from certified victims, prosecutors and judges is always sought and considered before making commutation recommendations.

*http://boardofparole.wy.gov/faq/faq.htm*

[¶ 77] In Wyoming, there is no basis to conclude that juveniles sentenced to life im-

---

10. Notably, the Wyoming Department of Corrections provides numerous programs and classes available to all incarcerated individuals, including those serving life sentences. *See http://www.boardofparole.wy.gov/institutionsandprograms/institutionalprograms.htm*. Some of the available services include: GED, educational, and vocational programs; Therapeutic Community (Casper); Intensive Treatment Unit; Thinking for a Change; Thinking Errors; Criminal Thinking; TACT (Treatment of Addiction and Criminal Thinking); Sex Offender Programming; Substance Abuse Programming; Parenting Programs; Mental Health Therapy; Relationship Skills; Life Without a Crutch; Vocational Programs; Correspondence Courses; Career Planning; Life Skills; and others. *Id.*

prisonment are *not* afforded a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. Wyoming provides juveniles the opportunity, while incarcerated, to develop emotionally, socially, and psychologically. This is sufficient to meet constitutional standards. *See* Sally Terry Green, *Realistic Opportunity for Release Equals Rehabilitation: How the States Must Provide Meaningful Opportunity for Release,* 16 Berkeley J. of Crim. Law 1, 6 (Spring 2011). Juvenile offenders sentenced to life imprisonment have access to institutional programs so as to mature and rehabilitate and may so demonstrate to the Wyoming Board of Parole which, in turn, may recommend a commutation of the sentence to the Governor. While release is, by no means, guaranteed, States are not required to guarantee that a juvenile offender, particularly one convicted of a homicide offense, will re-enter society. This Court concludes that, to the extent the mandates of *Graham* might apply to juvenile offenders convicted of homicide crimes, Wyoming has met the requirements of providing some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. In sum, while life *with* the possibility of parole is a severe sentence, it finds particular justification in the penalogical goals of retribution and incapacitation, particularly in cases involving a homicide. And, while, in the case of juvenile offenders, there may be somewhat lesser justification in the goals of deterrence or rehabilitation, even those goals are met by imposing the least severe penalty upon juveniles. Considering and balancing these four factors together, this Court concludes that Bear Cloud has not carried his burden of showing that, according to contemporary national standards of decency, the punishment of life with the possibility of parole for juvenile offenders is grossly disproportionate to the offense as a categorical challenge.

### ii. *As–Applied Constitutional Challenge*

 [¶ 78] While Bear Cloud spends considerably less time arguing that his life sentence is unconstitutional "as applied" to him, this contention warrants some attention and analysis: In considering a state-law constitutional challenge under Article 1, § 14, this Court historically has adopted the same proportionality analysis expressed by the United States Supreme Court in *Solem v. Helm,* 463 U.S. 277, 292, 103 S.Ct. 3001, 3011, 77 L.Ed.2d 637 (1983) and utilized in assessing an Eighth Amendment challenge:

> In *Solem v. Helm,* the U.S. Supreme Court adopted the following proportionality analysis, which the Wyoming Supreme Court has followed since *Oakley v. State,* 715 P.2d 1374, 1376–77 (Wyo.1986):
>
> > **In sum, a court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions.**
>
> *Solem,* 463 U.S. 277, 292, 103 S.Ct. 3001, 3011, 77 L.Ed.2d 637 (1983). In *Oakley,* **we stated that a proportionality analysis under *Solem* is only necessary where the sentence is grossly disproportionate to the crime.**
>
> > **We will not engage in a lengthy analysis under all three of the *Solem* criteria, including a consideration of the sentences imposed on similarly situated defendants in this and other jurisdictions, *except in cases where the mode of punishment is unusual or where the relative length of sentence to imprisonment is extreme when compared to the gravity of the offense* (the first of the *Solem* criteria). Oakley's sentence does not merit that kind of in-depth *Solem* analysis, and the *Solem* opinion does not require that kind of analysis in a case such as this.**
>
> *Oakley,* 715 P.2d at 1379. In subsequent cases, we reiterated this principle, stating:
>
> > Our rule is in accord with the approach taken by the United States Supreme Court in *Harmelin v. Michigan,* where the court concluded that the *Solem* proportionality analysis is appropriate only "in the rare case in which a threshold

comparison of the crime committed and the sentence imposed leads to an inference of **gross disproportionality.**" [*Harmelin*], 501 U.S. 957, 1005, 111 S.Ct. 2680, 2707, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring).

*Dodge v. State*, 951 P.2d 383, 385 (Wyo. 1997). This application of *Oakley* is still followed by this Court. *Suval v. State*, 6 P.3d 1272, 1274 (Wyo.2000).

*Sampsell*, ¶ 10, 17 P.3d at 728. *See also Graham*, 130 S.Ct. at 2021(the Eighth Amendment proportionality principle "forbids only extreme sentences that are 'grossly disproportionate' to the crime"). In this case, we do not need to engage in a proportionality analysis because the length of Appellant's sentence is not extreme or unusual when compared to the gravity of the offense. Instead, we will use our standard rubric for assessing the reasonableness of the sentence, which gives consideration to the crime, its circumstances, and the character of the defendant. *Frederick v. State*, 2007 WY 27, ¶ 32, 151 P.3d 1136, 1146 (Wyo.2007)....

*Tucker*, ¶¶ 49–50, 245 P.3d at 314–15 (emphasis added). *See also Sampsell v. State*, 2001 WY 12, ¶ 10, 17 P.3d 724, 728 (Wyo.2001); *Oakley*, 715 P.2d 1374, 1379 (Wyo.1986). In analyzing an as-applied challenge, this Court must consider the nature of the offense and the offender "in the concrete rather than the abstract." *In re Nunez*, 173 Cal.App.4th 709, 731, 93 Cal.Rptr.3d 242, 259–60 (Cal.App. 4 Dist.2009) (internal citations omitted).

[¶ 79] The first step in an as-applied challenge, then, is the consideration of whether Bear Cloud's sentence is extreme or unusual when compared to the gravity of the offense. This Court already has concluded that the imposition of a life sentence, in and of itself, is not cruel *nor* is it unusual in the context of a homicide case. *See Johnson*, ¶ 36, 61 P.3d at 1248–49 ("The imposition of a life sentence for a homicide is a time honored and entirely humane method of punishing that crime."). It is clear that the mode of punishment imposed on Bear Cloud is not unusual, as a sentence of life with the possibility of parole is the *least* severe sentence available for a felony-degree murder conviction. Further,

this Court is satisfied that the relative length of the sentence is not extreme in light of the circumstances disclosed by the record. Here, Bear Cloud was substantially involved in the planning of this armed burglary, even to the point of committing a prior vehicle burglary to obtain the murder weapon and securing dark clothing to conceal the identities of the three co-defendants. While he was not in possession of the murder weapon and did not shoot the victim, he was equally responsible for the planning, preparation, and commission of the underlying crimes. To assert that the use of the 9mm handgun was *not* foreseeable is specious: What other purpose would the acquisition of a deadly weapon serve than to have it available for possible use? Further, when Sen indicated that he wanted to "intimidate" or "interrogate" Mr. Ernst, Bear Cloud had ample notice of the likely sequence of events. While Bear Cloud contends he was not in the bedroom at the time of the murder, he has admitted that he understood that Sen was returning to the Ernst bedroom with the intent to confront Mr. Ernst and that he followed Sen and Poitra to the first floor. The evidence from the crime subsequently was found in Bear Cloud's residence and, finally, Bear Cloud volunteered that the consequences would have been even more egregious had he been the one to commit the murder. Without reason, excuse, explanation, or justification, these three co-defendants planned and committed the armed burglary of an occupied residence and killed a sleeping homeowner without provocation. The punishment here fits both the crime and the criminal. Bear Cloud's individual culpability, shown by his age, prior experiences with the justice system and law enforcement, personal characteristics, and state of mind, compared with the circumstances of the crimes committed, including such factors as motive, the way the crime was committed, the extent of Bear Cloud's involvement, and the consequences of his acts, also mark an objective relation between culpability and punishment. Considering and comparing all of the circumstances, this Court does not find gross disproportionality between the crime and the sentence.

[¶ 80] So finding, Bear Cloud's sentence simply does not merit an in-depth proportionality analysis for this Court to resolve his challenge to constitutionality. *See Suval v. State,* 6 P.3d 1272, 1274 (Wyo.2000); *Oakley v. State,* 715 P.2d 1374, 1379 (Wyo.1986); *Smith v. State,* 922 P.2d 846, 849 (Wyo.1996). The sentence of life imprisonment with the possibility of parole is not unconstitutional under these circumstances.

## V. *Constitutionality of Imposition of a Mandatory Life Imprisonment on a Juvenile*

[¶ 81] Finally, Bear Cloud argues that Wyo. Stat. Ann. § 6–2–101(b) is unconstitutional because it *requires* the imposition of nothing less than a life sentence for juveniles who are charged as adults and who commit felony murder, without the consideration of mitigating factors. *See generally* Alison Powers, *Cruel and Unusual Punishment: Mandatory Sentencing of Juveniles Tried as Adults Without the Possibility of Youth as a Mitigating Factor,* 62 Rutgers L.Rev. 241 (2009). Wyoming's sentencing scheme does not allow the sentencing court to consider the offender's age, culpability, life history, ability to reform, life potential, or other factors to impose a sentence for felony-murder.

### A. *Standard of Review*

[¶ 82] As set forth above, the standard of review for constitutional challenges is *de novo. See Reiter,* ¶ 7, 36 P.3d at 589.

### B. *Constitutionality of the Mandatory Nature of Wyo. Stat. Ann. § 6–2–101(b)*

[¶ 83] Wyo. Stat. Ann. § 6–2–101(b) states

A person convicted of murder in the first degree **shall** be punished by death, life imprisonment without parole or life imprisonment according to law, except that no person shall be subject to the penalty of death for any murder committed before the defendant attained the age of eighteen (18) years.

*Id.* (emphasis added).

█ Because Bear Cloud was sixteen years old at the time of the crime, the statute mandated that he receive a sentence of life imprisonment with or without the possibility of parole. Bear Cloud contends that the mandatory nature of the statute renders it unconstitutional. His argument must fail for two reasons: first, mandatory non-death sentencing schemes are not *per se* unconstitutional and, second, the district court *was* afforded the opportunity to consider mitigating factors when it heard and declined Bear Cloud's motion to transfer his case to juvenile court.

### i. *Constitutionality of Mandatory Sentencing Schemes*

█ [¶ 84] It is well established that the Eighth Amendment of the United States Constitution does not require "individualized sentencing" or consideration of mitigating factors in noncapital cases, *see Harmelin,* 501 U.S. at 994–95, 111 S.Ct. 2680 (Scalia, J.), 1006 (Kennedy, J., concurring), and, thus, the mandatory nature of a sentence will not render it a cruel and unusual penalty. *See Ward v. Evans,* No. CV 03–2076–DSF (JWJ), 2009 WL 3045752, at 17 (C.D.Cal. Sept.21, 2009) (not reported); *Rodriguez v. Peters,* 63 F.3d 546, 567–68 (7th Cir.1995) (holding that the Eighth Amendment does not require the sentencing court to consider mitigation before sentencing a juvenile to life in prison for murder because the Eighth Amendment individualized-sentencing requirement applies only in cases involving the death penalty). As a constitutional matter, mandatory life sentences for first-degree murder are treated no differently than optional life sentences for that crime. *See Harmelin,* 501 U.S. 957, 111 S.Ct. 2680. Simply because a life sentence is "mandatory" does not make it cruel and unusual. *Id. See also Johnson,* ¶¶ 35–36, 61 P.3d at 1249; *Miller v. State,* 63 So.3d 676, 691 (Ala.Crim.App.2010); *Torres v. State,* No. 504,2008, 2009 WL 1175048, at 1 (Del. Supr. May 1, 2009) (not reported). Bear Cloud makes no compelling argument, particularly in light of *Graham,* that the result should be different when a mandatory sentence is applied to a juvenile. *See Andrews,* 329 S.W.3d at 376–78. *But compare Illinois v. Miller,* 202 Ill.2d 328, 269 Ill.Dec. 503, 781 N.E.2d 300, 309 (2002) (where court found

the sentencing scheme unconstitutional). Numerous other states allow the imposition of mandatory, nonparolable life sentences on minors. *See Bentley*, No. 214170, 2000 WL 33519653, at 1–3 (not reported). And, in this case, Bear Cloud is afforded the possibility of parole. Rehabilitation and even release are still possible. Accordingly, his sentence does not constitute cruel or unusual punishment in contravention of Wyoming's constitution.

[¶ 85] Bear Cloud essentially asks this Court to act as a "super legislature" to rewrite the laws of this State under the guise of constitutional mandate. The Wyoming Legislature has discretion to prescribe penalties for defined offenses, and that discretion necessarily includes the power to prescribe mandatory sentences, even if these mandatory sentences restrict the judiciary's discretion in imposing sentences. Because the Wyoming Constitution does not mandate such a result, any change in policy desired by the will of the people must be resolved legislatively, not by judicial decree, consistent with the delicate balance of power placed upon the three branches of government. *See Pittman*, Nos. 04–GS–12–571, 04–GS–12–572, 2005 WL 831970, at 4 (not reported); *People v. Miller*, 202 Ill.2d 328, 269 Ill.Dec. 503, 781 N.E.2d 300, 306 (2002).

### ii. *Juvenile Court Considerations*

[¶ 86] Next, despite Bear Cloud's argument that he was sentenced without consideration of any mitigating circumstances, such was not the case. In contemplating the motion to transfer Bear Cloud's case to juvenile court, the district court specifically considered those factors enumerated in Wyo. Stat. Ann. § 14–6–237(b), namely:

(i) The seriousness of the alleged offense to the community and whether the protection of the community required waiver;

(ii) Whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner;

(iii) Whether the alleged offense was against persons or against property, greater weight being given to offenses against persons especially if personal injury resulted;

(iv) The desirability of trial and disposition of the entire offense in one (1) court when the juvenile's associates in the alleged offense are adults who will be charged with a crime;

(v) The sophistication and maturity of the juvenile as determined by consideration of his home, environmental situation, emotional attitude and pattern of living;

(vi) The record and previous history of the juvenile, including previous contacts with the law enforcement agencies, juvenile courts and other jurisdictions, prior periods of probation to this court, or prior commitments to juvenile institutions;

(vii) The prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile (if he is found to have committed the alleged offense) by the use of procedures, services and facilities currently available to the juvenile court.

*Id.*

In its enactment of the pertinent juvenile statutes, the Wyoming Legislature gave discretion to the district courts to determine whether a case warrants treatment in juvenile court based upon mitigating circumstances and other relevant factors. Obviously, any decision to transfer a case in which a juvenile is charged as an adult to the juvenile court necessarily means that the juvenile would be subject to lesser sanctions in the event of adjudication. The district court appropriately exercised its discretion and determined that this case did not so warrant. Here, then, Bear Cloud *was* permitted specific sentencing considerations, in advance of his guilty pleas, when the district court thoroughly considered and denied his motion to transfer his case to juvenile court. Once a juvenile's case is vested in the criminal courts, the public policies affording a juvenile different treatment than adults are no longer applicable. *See Carter*, 855 A.2d at 892; *Commonwealth v. Berry*, 785 A.2d 994 (Pa.Super.2001). In this case, Bear Cloud's attempts to transfer his case to juvenile court were unsuccessful. He ultimately pleaded guilty in adult/criminal court and was sanctioned in accordance with the legislatively-mandated punishment. The mandatory nature of his sentence was not unconstitutional

and his age does not entitle him to differential treatment in that regard.

## CONCLUSION

[¶ 87] For the reasons set forth herein, this Court concludes that the district court did not err in denying Bear Cloud's motion to transfer the proceedings to juvenile court nor did it abuse its discretion in denying his motion to withdraw his guilty pleas. To the extent his appellate claims survive the entry of a guilty plea, trial counsel was not ineffective in her representation of Bear Cloud. Further, Bear Cloud's assertion that his life sentence for felony-murder was unconstitutional, under either the United States Constitution or the Wyoming Constitution, must fail. A sentence of life imprisonment, with the possibility of parole, for a juvenile offender convicted of felony-murder satisfies the constitutional mandates of the Eighth Amendment of the United States Constitution and Article 1, § 14 of the Wyoming Constitution. Finally, Wyo. Stat. Ann. § 6–2–101(b) is not rendered unconstitutional by its mandatory sentencing structure, even as applied to a juvenile offender, and particularly in light of the district court's ability to consider mitigating circumstances when considering whether to transfer proceedings to juvenile court.

[¶ 88] Bear Cloud's convictions and sentences are affirmed in all respects.